Aleia L. ROBINSON, Plaintiff–Appellant,

v.

Marvin T. RUNYON, Postmaster General, United States Postal Service, Defendant–Appellee.

No. 96–4100.

United States Court of Appeals, Sixth Circuit.

Argued Dec. 12, 1997.

Decided July 22, 1998.

Peter A. Burr, Sheila M. Smith (argued
and briefed), Freking & Betz, Cincinnati,
OH, for Plaintiff–Appellant.

Jan M. Holtzman, Asst. U.S. Attorney, Of-
fice of the U.S. Attorney, Cincinnati, OH,
Janet E. Smith (argued and briefed), Wash-
ington, DC, for Defendant–Appellee.

Before: JONES and DAUGHTREY,
Circuit Judges; CARR, District Judge.*

NATHANIEL R. JONES, Circuit Judge.

Plaintiff Aleia Robinson appeals the ver-
dict, following a jury trial, for the defendant
United States Postal Service in this race
discrimination lawsuit under Title VII of the
Civil Rights Act of 1964, 78 Stat. 255, 42
U.S.C. § 2000e–2(a)(2). Robinson contends
that the district court erred by: 1) excluding

* The Honorable James G. Carr, United States Dis-
  trict Judge for the Northern District of Ohio,
  sitting by designation.
1. The lack of a thorough investigation into the
   accident was contrary to the Postal Service's
   own internal guidelines. The Postal Service La-
   bor Relations Manual provided that managers
   and supervisors were responsible for investigat-
   ing all accidents and promptly determining

two exhibits from trial and 2) failing to in-
struct the jury to consider punitive damages.
She also alleges that the selection of the jury
in her case was unconstitutionally obtained.
Because we find that the district court im-
properly excluded a key piece of evidence
from trial we **REVERSE** and **REMAND** the
case for a new trial.

I.

Plaintiff Aleia Robinson is a career em-
ployee of the Postal Service at the Cincinnati
Ohio Bulk Mail Center (CBMC), who began
her tenure in 1986, as a keyer clerk, and
continued in its employ until the incident
giving rise to this lawsuit occurred, when she
was terminated in January 1992. Prior to
the 1992 incident described below, Robinson
had never been disciplined by the Postal
Service and was considered an excellent
worker. J.A. (Joint Appendix) at 305.

During the early morning hours of Sunday,
January 26, 1992, as Robinson drove her car
into the curved CBMC driveway on the way
to work, it began to slide on ice residue left
from an earlier snow-fall. Robinson immedi-
ately applied her brakes and the car slid out
of control, hitting a utility pole on the driv-
er's side. At the time of the accident, Robin-
son had been traveling at approximately 25
mph, the posted speed limit for the driveway.
The impact of the car against the utility pole
trapped Robinson inside and emergency
crews were summoned to the scene. The
crews were required to break the windshield
and dashboard of Robinson's car, and fold up
the front corners of the hood in order to
remove her from the vehicle. Robinson was
then taken to the hospital where she was
treated and released shortly thereafter.

The subsequent investigation of the acci-
dent by the Postal Service was cursory at
best.1 Although Robinson asserted that her

their cause. J.A. at 269. It further provided
that in order to have first hand knowledge of
the incident, supervisors were required to make
thorough investigations including interviewing
employees and witnesses, and inspecting the ac-
cident site. *Id.* A Postal Service Supervisory
Guide also recommended specific procedures
for responses to accidents and maintained that
before imposing discipline, an employee must

speed was 25mph, a police officer who examined the scene after the accident estimated that Robinson was traveling at 55mph. The officer did note, however, on a specific box on the police report that the road conditions where the accident occurred were "other." For the Postal Service's part, no CBMC supervisors independently investigated the accident, and no witnesses were questioned concerning the accident or the condition of the driveway. Two Postal Service safety officers, Tim Rupe and William Zerhusen, did observe the scene three hours after the accident, and after looking at the damage to the car concluded preliminarily that the accident was caused by excessive speed.[2] Neither, however, spoke directly with Robinson nor questioned any employees. After viewing the police report, they again concluded that the accident was caused by excessive speed. Both recommended to Jack Everitt, Robinson's immediate supervisor and Bill Adams, the supervisor next in line of authority, that Robinson be terminated. In response to this recommendation, neither Everitt nor Adams conducted any independent inquiries concerning the accident, failing to ascertain whether there were any witnesses to the incident, or even to afford Robinson an opportunity to explain. Although Everitt, as Robinson's immediate supervisor was responsible for initiating the termination process, he did not read the police report of the accident and did not file an accident report within twenty-four hours as required by Postal Service policy.[3] Subsequently, after conferring with one another, Everitt and Adams both agreed that Robinson should be

terminated, and Everitt completed a request for disciplinary action, charging Robinson with willful disregard of safety rules, and relying in part on the police report that he had not read. J.A. at 286–287. The termination request was then forwarded to the "reviewing authority" Kevin Sullivan, General Supervisor, who also concurred in the decision to terminate Robinson, without independently investigating the incident.[4] On February 10, 1992, the Postal Service, through Everitt, issued a Notice of Removal to Robinson, notifying Robinson of her termination from the Postal Service due to "willful disregard of safety rules." J.A. at 466.

Following her termination, Robinson filed a grievance through her union challenging her discharge. An investigation into the accident following her grievance filing revealed that the investigating police officer had noted "other" on the police report because of the ice and water on the driveway. The investigation further revealed that the police officer had calculated Robinson's speed incorrectly, and that she had been traveling at a much lower rate of speed.

After this investigation, the union and the Postal Service entered into a settlement agreement wherein Robinson was reinstated to her position with back pay for the ten weeks she had been terminated. After exhausting her administrative remedies under Title VII, Robinson filed this lawsuit requesting compensatory damages in the amount of $250,000 for emotional distress, mental distress, anguish, and humiliation, and punitive damages in the amount of $500,000, alleging

be given an opportunity to tell his or her side of the story. Tr. (Transcript) at 53. The guide also provided that discipline must be imposed only for "just cause," meaning in part that a supervisor had conducted a thorough investigation, and had considered the employee's past work record. *Id.*

2. Supervisor Dennis McIntosh went out to the scene of the accident to summon safety crews and check on Robinson's well-being, but also did not investigate the incident.

3. Everitt testified that he did not file an accident report immediately because he initially viewed the accident simply as one involving a private citizen in her private vehicle. J.A. at 290. Obviously, Everitt later changed his mind, and subsequently determined that Robinson's termination

was warranted due to the danger to the safety of Postal Service employees.

4. According to Everitt's trial testimony, a Labor Relations Manager generally reviews discipline and if discipline is warranted writes the discipline, (Tr. at 84). Neither party in their briefs on appeal, however, indicates whether a Labor Relations Manager did in fact review Robinson's termination before it was implemented; Supervisor Dennis McIntosh signed Robinson's Notice of Removal on behalf of Everitt. J.A. at 466. It is therefore unclear whether a Labor Relations Manager was involved in the termination decision, and any such involvement appears to have been insubstantial.

that she was treated differently due to the racism of the Postal Service's management.

Prior to the trial, the magistrate judge assigned to the case determined that the Postal Service, as a government agency, could not be held liable for punitive damages under Title VII. In addition, the Postal Service filed a motion in limine to exclude two pieces of exhibit evidence under Rule 403 of the Federal Rules of Evidence, that Robinson intended to offer as evidence to support her contentions that racism was pervasive at the CBMC and played a role in her termination.

One exhibit was a fake employment application entitled "Nigger Employment Application," which incorporated a litany of racial stereotypes of African–Americans, and charactered a real application.[5] The other exhibit was that of a photograph of a hangman's noose that a white employee had drawn and displayed to an African–American employee, Ms. Brenda Kaiser.

According to Robinson's proffer at trial, she had been prepared to present witnesses who would have testified that the fake employment application was widely circulated throughout the CBMC on several occasions in 1992, and that no employee was ever disciplined. One witness would have testified that she observed supervisors reading this document and laughing. Robinson also had additional evidence that employees brought the application directly to the attention of Supervisor Adams and that no disciplinary action was taken against anyone at the CBMC.[6] Ms. Kaiser, another CBMC employee, would have testified that she was so intimidated by the hang noose incident that she complained to her supervisor and left work for the rest of the day. She would have testified further that the supervisor did not discipline the employee who drew the menacing picture, but merely stated that he was just a "frustrated Boy Scout who liked to tie knots." This incident occurred approximately one year after Robinson's termination.

In a single terse line of his two page opinion, the magistrate judge granted the Postal Service's motion in limine to exclude both pieces of evidence, simply stating that they were not relevant and that their danger of unfair prejudice outweighed their probative value. The trial then ensued. During the trial, Robinson submitted evidence that only one white CBMC employee, Richard Kriege, a trailer-tractor operator, had ever been terminated for involvement in a motorized vehicle accident, and that no CBMC employee had ever been terminated for an accident occurring in his or her own private car. She presented further evidence that the Postal Service had conducted an extensive investigation into Kriege's accident before discharging him, including interviewing employees and several witnesses, conducting an internal investigation by a Postal Service accident investigator, and obtaining an independent investigation from an outside consulting firm. J.A. at 434–35. According to the testimony of Tom Lang, the Postal Service Human Resource Officer, the extensive investigation into Kriege's accident occurred as a result of the Postal Service's wish to be fair to Kriege because "his job was at stake." J.A. at 437–38. Robinson presented further evidence at trial that several white CBMC employees, who had been involved in accidents with Postal Service forklifts and tractor-trailers, were not terminated and in some cases received no discipline whatsoever. Significantly, Robinson's position as a keyer clerk, unlike that of Kriege's and other white CBMC employees who were involved in tractor-trailer and forklift accidents, yet not terminated, did not require that she drive a Postal Service vehicle or any other kind of industrial vehicle.[7]

---

5. For example, the application had a line for place of birth and listed the choices: zoo, cotton field, back alley and animal hospital.

6. The specific witness testimony concerning Adams was not proffered at the trial, but was made known to the district court through the proceedings on the Postal Service's motion in limine where Robinson specified that she had two witnesses who would testify that Adams knew of the circulation of the fake employment application, yet took no action to have it removed. J.A. at 232.

7. The incident which has been considered most similar to Robinson's case involved a white probationary employee, Michael Rash (spelled in trial transcript as Roesch), who was terminated

Additionally, to buttress her claims that she had been treated differently because of her race, Robinson presented evidence intended to illustrate the racially hostile attitudes among the management at CBMC, and specifically those involved in her termination. One witness testified that Supervisor Everitt had called her a "black bitch" and had, through job assignments and discipline, treated white employees much more favorably than African–Americans. A CBMC employee also testified that Supervisor Adams had used the word "Nigger" to refer to an African–American employee. After the trial, an all-white jury found for the defendant Postal Service. This timely appeal followed.

## II.

### A.

The first issue on appeal concerns the district court's determination to exclude evidence on the grounds that the evidence was not relevant and that its danger of unfair prejudice was outweighed by its probative value. We review a district court's exclusion of evidence on the grounds of relevancy and its balancing of the potentially unfair prejudicial impact of evidence against its probative value for an abuse of discretion. *See United States v. Thomas,* 74 F.3d 701, 714 (6th Cir.1996). In so doing, we must view the evidence in the light most favorable to its proponent giving the evidence its maximum probative force and its minimum reasonable prejudicial value. *Id.; see also Sutkiewicz v. Monroe County Sheriff,* 110 F.3d 352, 360 (6th Cir.1997); *Laney v. Celotex Corp.,* 901 F.2d 1319, 1320–21 (6th Cir.1990); *United States v. Schrock,* 855 F.2d 327, 333 (6th Cir.1988). An abuse of discretion exists where the reviewing court is firmly convinced that a mistake has been made. *Schrand v.*

*Federal Pac. Elec. Co.,* 851 F.2d 152, 157 (6th Cir.1988).

### B.

It is hard to determine exactly why the district court ruled that the evidence of the fake employment application was irrelevant because it made no specific findings in that respect. The rules regarding relevancy, however, are quite liberal and provide that "evidence having *any* tendency to make the existence of any fact that is of consequence to the determination of the action more probable or less probable than it would be without the evidence" is relevant. Fed.R.Evid. 401 (underline added). Neither the appellate nor the district court is permitted to consider the weight or sufficiency of the evidence in determining relevancy and "[e]ven if a district court believes the evidence is insufficient to prove the ultimate point for which it is offered, it may not exclude the evidence if it has even the slightest probative worth." *Douglass v. Eaton Corp.,* 956 F.2d 1339, 1344 (6th Cir.1992). Here Robinson alleges that she was treated differently because of her race and in violation of Title VII. Evidence of a racially hostile atmosphere that was condoned by the supervisors in the CBMC clearly is relevant to such a proposition because it illustrates the attitudes of those supervisors. Therefore, the racist employment application, which was circulated and allegedly known to upper level management, yet not immediately condemned, plainly makes the existence of racially motivated actions by management of the CBMC more probable. *Cf. Polanco v. City of Austin, Texas,* 78 F.3d 968, 980 (5th Cir.1996) (noting that evidence of discriminatory practices against Hispanics in the workplace was probative of whether the individual plaintiff was terminated because of his nationality); *Estes v. Dick Smith, Ford Inc.,* 856 F.2d 1097, 1103 (8th Cir.1988) (finding

from the Postal Service for an unsafe act involving a vehicular accident in a Postal Service parking lot at a different site. Even this case is not overly probative, however, because Michael Rash was not employed at the CBMC, but at the Postal Service's Main Office in Cincinnati, and had different supervisors than Robinson. Robinson's allegations of racial discrimination concern the management at her particular site, not those elsewhere and thus the handling of Rash's claim

by other supervisors would appear irrelevant in this case. Moreover, Michael Rash, as a probationary employee was in a much different position than Robinson, who at the time of her accident had been employed by the Postal Service for five years without incident and was regarded as an excellent worker. Additionally, Rash was terminated in 1996, four years after the incidents occurring in this case. J.A. at 503.

that background evidence of an employer's discriminatory history and work practices is relevant to determination of whether an individual employee was disparately treated even when none of that past discrimination was aimed specifically at the employee involved); *Conway v. Electro Switch Corp.*, 825 F.2d 593, 597 (1st Cir.1987) (noting that "circumstantial evidence of a discriminatory atmosphere at a plaintiff's place of employment is relevant to the question of motive in considering a discrimination claim" and that "[w]hile evidence of a discriminatory atmosphere may not be conclusive proof of discrimination against an individual plaintiff such evidence does tend to add 'color' to the employer's decision making processes and to the influences behind the actions taken with respect to the individual plaintiff.").

■ In *Estes*, the court, in finding evidence of statistical disparities and racially discriminatory treatment of black customers relevant to the plaintiff-employee's individual disparate treatment case, noted that "circumstantial proof of discrimination typically includes unflattering testimony about the employer's history and work practices—evidence which in other kinds of cases may well unfairly prejudice the jury against the defendant. In discrimination cases, however, such background evidence may be critical for the jury's assessment of whether a given employer was more likely than not to have acted from an unlawful motive." *Estes*, 856 F.2d at 1103. We agree. Robinson is permitted to establish credence for her argument that discrimination played a role in her termination by presenting evidence of the racially hostile attitudes in her particular office and racial insensitivity among the supervisors within that office. We are guided in this determination by the reality that intentional discrimination is often difficult to prove without significant reliance on circumstantial evidence. Rarely will there be direct evidence from the lips of the defendant proclaiming his or her racial animus. *See Kline v. Tennessee Valley Authority*, 128 F.3d 337, 348 (6th Cir.1997) ("It is the rare situation when direct evidence of discrimination is readily available, thus victims of employment discrimination are permitted to establish their cases through inferential and circumstantial proof."). Therefore, we must be mindful not to cripple a plaintiff's ability to prove discrimination indirectly and circumstantially "by evidentiary rulings that keep out probative evidence because of crabbed notions of relevance...." *Estes*, 856 F.2d at 1103 (quoting *Riordan v. Kempiners*, 831 F.2d 690, 697 (7th Cir.1987)).

We therefore disagree with the Postal Service's argument that simply because Robinson failed to show that Everitt (who was one of the supervisors involved in the termination process) was connected with the application, that the application was not relevant. The Postal Service employed a detailed system of review of termination decisions specifically to avoid relying on one supervisor who may harbor improper motives. Thus, Everitt's connection (or lack of one) to the two pieces of evidence is not conclusive either way. The Postal Service itself acknowledges that at least one supervisor, Adams, who was also involved in Robinson's termination may have been aware of the application yet did nothing to thwart the dissemination of such racially offensive material in the workplace.[8] In her claim, Robinson asserts that the management

---

8. It is also no answer for the Postal Service to assert that Everitt or Adams may not have had the final or the sole say in Robinson's termination. Robinson has shown both possible bias on their part, and that they were involved in the decision to terminate her. If higher level officials, who were not tainted with such bias, or were unaware of the application, in fact made the decision to terminate Robinson without regard to the views of Everitt or Adams, it was the Postal Service's burden to produce evidence showing that such was the case.

Moreover, with regard to Adams in particular, it is curious that the Postal Service did not challenge the admission of the racist statements

made by him, as irrelevant and prejudicial. His making of racist statements seems not so different than the conscious acceptance of racist material in his workplace. While the Postal Service may not agree that Adams made the determinative decision in the case, by not challenging his racist statements, the Postal Service recognized, implicitly at the very least, that Adam's attitude toward African–American employees was clearly relevant in the case. That this attitude may be inferred both by statements he made, and actions he should have but did not take (such as attempting to remove racist material from the work place), is immaterial.

of the Postal Service was hostile to racial minorities and this affected the decision to terminate her; she is not suing individual persons and has connected the bogus application directly to her own work area and to one of the managers involved in the case. While the fake employment application alone may not prove Robinson's case, and may require inferences to be drawn by the jury, that fact does not make it any less relevant. It remains as a possible link. *See, e.g., Abrams v. Lightolier Inc.,* 50 F.3d 1204, 1214 (3d Cir. 1995) (noting that "discriminatory comments by nondecisionmakers, or statements temporally remote from the decision at issue, may properly be used to build a circumstantial case of discrimination") (citations omitted); *E.E.O.C. v. Manville Sales Corp.,* 27 F.3d 1089, 1094 (5th Cir.1994) (noting that evidence of a manager's age-related statements in an age discrimination case was relevant even though the manager did not formally make the final decision to discharge the plaintiff-employee where he recommended the discharge and was relied on to some degree); *Wilson v. Monarch Paper Co.,* 939 F.2d 1138, 1145 (5th Cir.1991) (holding that age-related comments by various supervisors of plaintiff-employee would support finding of discrimination even though higher level official made the final decision to terminate him).

This case is unlike our decision in *Schrand v. Federal Pacific Elec. Co.,* 851 F.2d 152 (6th Cir.1988), where this court did find as irrelevant, evidence of discriminatory comments by certain managers of the defendant-employer. In *Schrand,* an age discrimination case, this court found that the district court had erred in admitting testimony by two employees of a national corporation, that certain managers had informed them that they were being terminated because they were too old. The court found that these statements were not relevant because the manager who made the decision to terminate the plaintiff-employee in the case was not involved in the decision to terminate either of the two witnesses, since neither of the witnesses even worked in the same region as

the plaintiff-employee. *Id.* at 156. In finding that there was no evidence to logically or reasonably tie the decision to terminate the plaintiff-employee to the alleged statements of the witnesses, this court noted that "[t]he fact that two employees of a national concern, working in places far from the plaintiff's place of employment, under different supervisors, were allegedly told they were being terminated because they were too old, is simply not relevant. . . ." *Id.* In the present case to the contrary, the racist application was circulated in the CBMC, directly where Robinson worked, and known to at least one of the managers directly involved in her termination. If as in *Schrand,* however, the racist application had been circulated in some other Postal Service location outside of Cincinnati, or even the Main Office in Cincinnati, clearly the application would be much less relevant.

■ We do conclude, however, that the district court did not abuse its discretion by excluding the photograph of the hang noose. Because the hang noose incident had a tenuous connection to the factual allegations of this case—it occurring one year after Robinson's termination with no direct connection to any of the supervisors involved in the decision to terminate—we find that the district court did not err in its decision to exclude that exhibit.

### C.

■ The district court also determined that the probative value of the two pieces of evidence was substantially outweighed by the danger of unfair prejudice.[9] Here the task is again made difficult on appellate review because the court did not make any specific findings with respect to its balancing determination. We find, however, that with regard to the bogus application, the district court's ruling was a clear abuse of discretion.

■ Federal Rule of Evidence 403 prohibits the admission of evidence if there is a danger of *unfair* prejudice, not mere preju-

---

**9.** Because we determined that the picture of the hang noose was properly excluded as not relevant, we do not discuss whether it should also be

excluded because its probative value was outweighed by the danger of unfair prejudice.

dice. *See* Fed.R.Evid. 403; [10] *see also Koloda v. General Motors Parts Div., General Motors Corp.,* 716 F.2d 373, 378 (6th Cir. 1983) (quoting *Dollar v. Long Mfg., N.C. Inc.,* 561 F.2d 613, 618 (5th Cir.1977)) ("Virtually all evidence is prejudicial or it isn't material. The prejudice must be unfair."). The district court did not indicate how the employment application would be unfairly prejudicial to the defendants, and the Postal Service seems to argue that the evidence is unfairly prejudicial simply because it is racially inflammatory. Such an argument is clearly insufficient to exclude evidence under Rule 403. As Robinson asserts, the racially inflammatory nature of the evidence involved here is precisely why it is probative of the racially discriminative motives alleged in this case. Moreover, in nearly every discrimination case there are often instances of extremely offensive remarks, caricatures, and jokes. Those shocking messages, offensive though they may be to the court and to the jury, comprise the signature element of a discrimination case. If we confined our considerations solely to defendants exclaiming "I hate ——," we would effectively remove the inferences permissible in circumstantial cases such as the one at bar. *See Kline,* 128 F.3d at 348. It is axiomatic that the available evidence provided to establish racial animus may be racially inflammatory.[11] Therefore, defendants must allege more than merely the racially offensive nature of the evidence in order to establish a danger of unfair prejudice. "Unfair prejudice does not mean the damage to a defendant's case that results from the legitimate probative force of the evidence; rather it refers to evidence which tends to suggest a decision on an improper basis." *United States v. Bonds,* 12 F.3d 540, 567 (6th Cir.1993) (citation and quotation marks omitted); *see also Doe v. Claiborne County, Tennessee,* 103 F.3d 495, 515 (6th Cir.1996).

We thus give no credence to the argument that the introduction of the racist application

would have somehow placed an emotional element that was otherwise lacking in this case, *see Schrand,* 851 F.2d at 156, thereby suggesting a decision on an improper basis, because unlike *Schrand,* the emotional element was already present. In attempting to illustrate the racist attitudes among the management of the CBMC involved in her termination, Robinson had already provided evidence of offensive racial slurs made by both Everitt and Adams. Had the evidence of the racist employment application been admitted at trial, the Postal Service would have had an opportunity to explain why the application was not removed from the workplace, who was aware of the application, and why no disciplinary measures were taken. This court has expressly noted that even in cases of shaky evidence, "vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking" such evidence, not exclusion. *Doe,* 103 F.3d at 515 (citation and quotation marks omitted).

■■■ Thus we find an abuse of discretion where as here, the district court on the basis of Rule 403 was overly restrictive and precluded Robinson from the full opportunity to present her case to the jury. *See id.* Robinson is entitled to a new trial because the exclusion of the racist employment application rendered a substantial injustice. She relied heavily on circumstantial evidence to carry her burden of proof, and thus each piece of evidence served to complete part of the puzzle of this case. The absence of even one piece of highly relevant evidence may have made the difference in the jurors' minds and its exclusion was therefore far from harmless. Accordingly, we find that Robinson is entitled to a new trial on that basis.

### III.

■■■ Robinson argues that the district court erred by failing to instruct the jury to

10. Rule 403 provides that relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." Fed.R.Evid. 403.

11. Indeed, the more offensive the material in this case, the more telling that Adams may not have attempted to do anything about it, when confronted.

consider punitive damages. The magistrate judge found on his own motion, that under the Civil Rights Act of 1991, the Postal Service was a government agency and was therefore specifically exempted from punitive damages under 42 U.S.C. § 1981 et. seq. We agree.

Congress amended Title VII in 1991 to permit punitive damages in Title VII actions. The amendment however specifically exempted governments, government agencies and political subdivisions. *See* 42 U.S.C. § 1981a(b)(1).[12] Relying heavily on a district court decision in *Baker v. Runyon*, 922 F.Supp. 1296 (N.D.Ill.1996), Robinson argues that the Postal Service is not a government agency, but rather more similar to a commercial enterprise. In addition, Robinson contends that when Congress designated the Postal Service as a "sue and be sued" entity under 39 U.S.C. § 401(1), waiving its sovereign immunity, it indicated that the Postal Service should be treated as any other private business, and accordingly that punitive damages are permitted. Finally, Robinson asserts that the traditional reasons for exempting the government from punitive damages do not apply in the case of the Postal Service, because the Postal Service operates on its own revenues and has no tax levying authority.

We note initially that *Baker v. Runyon*, which serves as the primary support for Robinson's contentions, was reversed on appeal by the Seventh Circuit, and the majority of the arguments therein soundly rejected by that court. *See Baker v. Runyon*, 114 F.3d 668, 670 (7th Cir.1997). In beginning our analysis of the issue, we turn first to the plain language of the statute which expressly exempts "government agencies" from punitive damages. Our inquiry then becomes whether the Postal Service qualifies as a "government agency" under the statute.

The answer to that inquiry is unequivocally in the affirmative. Although the Postal Service has a "commercial like" operation, it

functions as part of the federal government. *See Silver v. United States Postal Service*, 951 F.2d 1033, 1035 (9th Cir.1991) ("Congress could not have made its intent more clear that the Postal Service was to remain a part of the U.S. Government and to perform executive branch functions with that government."); *see also Baker*, 114 F.3d at 670; *Young v. United States Postal Service*, 869 F.2d 158, 159 (2d Cir.1989) (finding that although Congress waived sovereign immunity for the Postal Service, the waiver did "not change the fact that the party being sued [was] still the federal government" and that "[t]he Postal Service is an 'independent establishment of the executive branch of the Government of the United States'.") (citation omitted); *Friedlander v. United States Postal Service*, 658 F.Supp. 95, 101 (D.D.C.1987) ("Congress did not intend to create a private business rather it desired a more efficient government agency."). The Postal Service Reorganization Act states that it "shall be operated as a basic and fundamental service provided to the people *by the Government of the United States*, authorized by the Constitution, created by Act of Congress, and supported by the people." 39 U.S.C. § 101(a) (underline added). Postal Service employees are treated as federal employees for purposes of civil service, 39 U.S.C. § 1001(b), federal criminal laws, 39 U.S.C. § 410(b)(2), veteran's preference requirements, 5 U.S.C. § 2108, and standards of suitability, security, and conduct of federal employees, 39 U.S.C. § 410(b)(1). It has uniquely governmental powers such as the authority to borrow money backed by the full faith and credit of the United States Government, 39 U.S.C. § 2006(c), the right of eminent domain, 39 U.S.C. § 401(9), and the right to negotiate international postal treaties and conventions, 39 U.S.C. § 407.

Nor does Congress' waiver of sovereign immunity and designation of the Postal Service as a "sue and be sued" entity alter this

---

12. The amendment provides in pertinent part:

A complaining party may recover punitive damages under this section against a respondent (other than a government, government agency or political subdivision) if the complaining party demonstrates that the respon-

dent engaged in a discriminatory practice or discriminatory practices with malice or with reckless indifference to the federally protected rights of an aggrieved individual. 42 U.S.C. § 1981a(b)(1).

determination and its exemption from punitive damages under Title VII. While Robinson argues that this court should liberally construe the waiver of sovereign immunity to encompass punitive damages, she neglects to argue how such a waiver affects the explicit exemption of government agencies in Title VII. Even with a waiver, a court must nevertheless inquire "whether the source of substantive law upon which the claimant relies provides an avenue for relief." *Federal Deposit Ins. Corp. v. Meyer*, 510 U.S. 471, 484, 114 S.Ct. 996, 127 L.Ed.2d 308 (1994); *see also Baker*, 114 F.3d at 670 (noting that in determining whether an individual can recover damages against the federal government there are two analytically distinct inquiries, whether there has been a waiver and if so, whether the source of the substantive law provides a basis for relief) (citations and quotation marks omitted). As the magistrate judge did in *Baker v. Runyon*, Robinson appears to have conflated the two inquiries— waiver and the substantive law. *See Baker*, 114 F.3d at 671. Construing the waiver of sovereign immunity "liberally" to encompass punitive damages in this case fails to provide Robinson the relief requested, because the substantive law here, Title VII, explicitly exempts government agencies from punitive damages. She then returns to ground zero—confronted with the issue of whether the Postal Service is a government agency and exempted under Title VII. *See id.* Robinson's reasoning is flawed because she fails to recognize that simply because Congress has provided that an entity may generally be sued for damages, does not equate with the presumption that the particular law under which a plaintiff brings suit will permit such damage awards. Moreover, the sovereign immunity argument made by Robinson in actuality cuts against her. The mere fact that Congress even had to explicitly waive the sovereign immunity of the Postal Service in the first place indicates that Congress considered the Postal Service a federal agency, or otherwise such a waiver would be unnecessary. *See id.* at 670; · *see also Western Securities Co. v. Derwinski*, 937 F.2d 1276, 1280 (7th Cir.1991) ("The 'sue or be sued' clause ... operates as the necessary waiver of sovereign immunity, permitting the suit to go forward notwithstanding that it is a suit against a federal agency.").

It is therefore clear that the Postal Service is a government agency for purposes of Title VII and accordingly we follow the Seventh Circuit in finding that as such the Postal Service is exempt from punitive damages. *See Baker*, 114 F.3d at 671–72; *see also Ausfeldt v. Runyon*, 950 F.Supp. 478, 487–88 (N.D.N.Y.1997) (finding Postal Service was immune from punitive damages under Title VII. because it was a part of the federal government); *Miller v. Runyon*, 932 F.Supp. 276, 277 (M.D.Ala.1996) (finding Postal Service was a government agency for purposes of Civil Rights Act of 1991 and therefore could not be sued for punitive damages).

■■■ We decline to review the claim that there was bias in the selection of the all white jury that considered her case. Robinson did not raise this claim in the trial court, and accordingly it has not been preserved for review here. *United States v. Broadus*, 7 F.3d 460, 463 (6th Cir.1993); *see also Howard v. Grinage*, 82 F.3d 1343, 1352 (6th Cir. 1996); *Roush v. KFC Nat'l Management Co.*, 10 F.3d 392, 397 (6th Cir.1993).

### IV.

For the foregoing reasons we **REVERSE** and **REMAND** the case for a new trial consistent with this opinion.