JOURNAL ENTRY and OPINION
{¶ 1} After being terminated for sexually harassing a female co-worker in articles he wrote for an unauthorized newsletter distributed to co-workers, plaintiff police lieutenant Harvey McGowan filed a complaint against his employer, defendant Cuyahoga Metropolitan Housing Authority (" CMHA") alleging that his termination was racially motivated. CMHA sought summary judgment on grounds that McGowan had not established a prima facie case of race discrimination and that, in the alternative, it stated a legitimate business reason for the termination because McGowan subsequently retaliated against the person he had sexually harassed. McGowan argued that CMHA's stated reasons for termination were pretext because it treated other employees outside the class more favorably. The court granted summary judgment to CMHA and the sole assignment of error broadly contests that judgment.
 {¶ 2} R.C. 4112.02(A) stated that it shall be an unlawful discriminatory practice "[f]or any employer, because of the race, color, religion, sex, national origin, disability, age, or ancestry of any person, to discharge without just cause, to refuse to hire, or otherwise to discriminate against that person with respect to hire, tenure, terms, conditions, or privileges of employment, or any matter directly or indirectly related to employment."
 {¶ 3} R.C. Chapter 4112 closely tracks federal discrimination laws, so we can apply federal authority to cases involving alleged violations of R.C. Chapter 4112. See Plumbers Steamfitters Joint Apprenticeship Commt. v. Ohio Civil RightsComm. (1981), 66 Ohio St.2d 192, 196.
 {¶ 4} Direct evidence of any kind of discrimination is rare because discriminators rarely act directly. Robinson v. Runyon
(C.A. 6, 1998), 149 F.3d 507, 513. In the absence of direct discrimination, an employee can prove race discrimination indirectly by making a prima facie case that shows the claimant (1) belongs to a racial minority; (2) was discharged; (3) was qualified for the position; and (4) was replaced by, or the discharge permitted the retention of, a person who was not a member of the protected class. See Plumbers Steamfitters JointApprenticeship Commt. v. Ohio Civ. Rights Comm. (1981),66 Ohio St.2d at 197; Texas Dept. of Community Affairs v. Burdine
(1981), 450 U.S. 248, 252-253, citing McDonnell Douglas Corp. v.Green (1973), 411 U.S. 792, 802. If the employee establishes a prima facie case, the burden then shifts to the employer to show a legitimate, nondiscriminatory reason for the employee's discharge. Id. If the employer makes this showing, the burden shifts once again to the employee, who then is given the opportunity to demonstrate that the employer's articulated reasons for the discharge are merely a pretext for impermissible race discrimination. Id.
 {¶ 5} CMHA did not contest that McGowan established the first three elements of the prima facie case: he was black, he had been discharged, and he was qualified for the position. CMHA did contest the fourth element: that McGowan was replaced by a person outside the protected class. In its motion for summary judgment, CMHA submitted evidence that after learning of the sexual harassment charge filed against McGowan, it reassigned him from being a third shift supervisor to special projects coordinator. It then filled the third shift supervisor position with a person who was in the protected class.
 {¶ 6} McGowan does not dispute that his former job had been filled by a person within the protected class, but argued that he had not been treated comparably to other employees who had been the subject of sexual harassment complaints by co-workers.
 {¶ 7} In Grayson v. O'Neill (C.A. 7, 2002), 308 F.3d 808,818-819, the Seventh Circuit Court of Appeals stated:
 {¶ 8} "When a plaintiff produces evidence sufficient to raise an inference that the employer applied its legitimate expectations in a disparate manner, the second and fourth prongs of McDonnell Douglas merge, allowing the plaintiff to establish a prima facie case by establishing that similarly situated employees were treated more favorably.
 {¶ 9} "To meet his burden of demonstrating that another employee is `similarly situated,' a plaintiff must demonstrate that there is someone who is directly comparable to him in all material respects. In this inquiry, a `court must look at all relevant factors, the number of which depends on the context of the case.'" (Citations omitted.)
 {¶ 10} McGowan's offered evidence of disparate treatment of comparable officers is not on point. The two CMHA employees referred to in his evidence were not lieutenants, they were sergeants. McGowan conceded in his deposition that as a lieutenant, sergeants were under his command, so they were presumably not in positions of equal or comparable authority.
 {¶ 11} Neither of these sergeants were ever found to have sexually harassed female co-workers. One of the sergeants had two claims filed against him. The first claim occurred in 1989 and resulted in the sergeant being demoted to the rank of police officer "for violating his supervisory position by engaging in sexual conduct with another employee, on CMHA property and while the other employee was on duty for CMHA." The details of the incident, as told by the participants, conflicted on the consensual nature of the acts involved. An internal investigation showed that the county prosecutor had been consulted for a possible criminal prosecution, but it does not appear as though the sergeant was charged with any criminal offense. It thus bears repeating that CMHA did not make a finding that sexual harassment occurred, but did acknowledge that regardless of whether the sexual conduct had been consensual, the sergeant's conduct reflected poorly on CMHA.
 {¶ 12} The second incident involving this sergeant occurred in 1999. The sergeant had repeatedly asked a female subordinate to arrange a date between him and a third female CMHA employee. When the subordinate refused, she claimed that the sergeant retaliated against her. An internal review concluded that no sexual harassment had occurred, but that the sergeant had engaged in conduct" unbecoming an officer or employee." As a result of his conduct, the sergeant received a five-day suspension.
 {¶ 13} There was only one incident involving the second sergeant, and the substance of the disciplinary action against him did not directly involve sexual harassment. It appears that in 1997, several members of the CMHA SWAT team, including this sergeant, changed their clothes in front of a female detective. The evidence submitted by McGowan did not show that the underlying facts of this incident were the subject of disciplinary action. The evidence shows that those males involved in the incident apologized to the female detective. Some time after the incident, the sergeant was heard making reference to the prior incident during an inadvertent open radio broadcast. McGowan did not submit a recording of the broadcast, but he did attach a copy of a departmental transcription of the broadcast, which we accept as accurate for purposes of summary judgment. Comments attributable to the sergeant were "yeah, all six of us took off our clothes;" "* * * seriously though, we should all do like a chorus line, you know;" and "She'll write us up `they were all naked in a chorus line.'" CMHA investigated the open microphone incident and suspended the sergeant for one day for "improper procedures re: radio transmissions." While McGowan's evidence relating to the sergeant's broadcast suggests a sexual overtone, the department did not treat the incident as one relating to sexual harassment. McGowan submitted no evidence to show that any of these three incidents resulted in formal sexual harassment charges by the Equal Employment Opportunity Commission ("EEOC").
 {¶ 14} By contrast, McGowan's conduct directly created a hostile work environment, as charged by the EEOC. As the self-styled publisher of an unauthorized employee newsletter, McGowan specialized in publishing generally puerile items of gossip involving fellow officers. Many of these congratulated male officers on fathering children. One representative piece noted how one new father was perplexed by the birth of a son, as "he wore his rubbers" and to be "extra safe he even worn [sic.] a raincoat and hat." Another piece advised colleagues of a new way to avoid paying child support: "MARRY HER!" McGowan included in one issue an "I.Q. TEST" in which he described a scenario where "you take a Whogee [sic., "hoochie?"] home, you go to sleep, while the Whogee claims she is taking a shower. You wake up and your car is gone and you didn't get any. Are You: Stupid, Dumb, Super Stupid, Fool, Retarded, Damn Dummy, Lost in Space, All of the above. Clue one: Whogee's don't shower! Lucky Lottery number _08."
 {¶ 15} The item at the heart of the discharge in this case was published in September 1997 in which McGowan made a car accident between two CMHA officers, one of whom was the victim of McGowan's sexual harassment, appear to be a sexual encounter. At the time, McGowan was the third shift supervisor and supervised the female officer. McGowan used the headline "CAUGHT IN PARKING LOT" and included just above that headline a graphic of a partially-opened zipper. The item read:
 {¶ 16} "You can imagine the surprise of on-lookers in the early morning of July 19, when [the male officer] was caught banging [the female officer] in the parking lot. One of the first to caught [sic.] the two was [a communications officer], for the first time the mighty mouth was left hanging with nothing to say due to shock. After being caught [the male officer] gather [sic.] his belongings and hastily left the parking lot, leaving [the female officer] lingering."
 {¶ 17} On the same page McGowan included a cartoon image of a video camera with the caption "VIDEO QUEEN?????? Linda Lovelace watch out!!!!!!"
 {¶ 18} Shortly after McGowan published the item, a fellow officer told the female officer, "you ought to be pissed off, huh?" She did not understand his meaning, and he said that she must not have seen "The Scoop." When she replied that she had thrown it in the trash without reading it, he told her that she was in it in an item about a video. When she asked him to explain, he shrugged his shoulders and left. The female officer said that after the item ran, other male officers began calling her for dates. She then went to McGowan and asked him to keep her out of his newsletter.
 {¶ 19} McGowan did not heed the female officer's complaint and began to make her the target of ridicule. He included this "editorial" in his next issue, dated October 1997:
 {¶ 20} "The Editor of the Scoop has receive [sic.] threats directly or indirectly. Let it be known that he will not be intimidated. The SCOOP is synonym [sic.] with the TRUTH! And the truth shall set you free. Free your mind and you're a ____ will follow. The SCOOP will remain committed to journalistic integrity. Viva la Scoop."
 {¶ 21} In that same issue, he published a gossip item asking, "What unname [sic.] PO is planning a wedding next year on 8/8 at 10 o'clock, with the love of his life. Surprise, Surprise! Can you find the clues." The female officer interpreted the numbers 8/8 and 10 o'clock as being badge numbers 88 and 10. She carried badge number 10. Badge 88 referred to another officer with whom she shared a moment of grief at the funeral of a deceased CMHA officer.
 {¶ 22} McGowan profiled the officer who carried badge 88 in that same issue and stated that the officer's "life long craving is to make love in the RCC to anybody while dress [sic.] like Dennis Rodman, wearing a Madonna wig. NO VIDEO." The female officer worked in the RCC at the time and believed the "NO VIDEO" statement was a reference to the September 1997 issue with the "VIDEO QUEEN" item.
 {¶ 23} The female officer then decided to file a formal complaint against McGowan. Soon after, McGowan began to retaliate by writing her up for work infractions, some of which were not her fault. McGowan then filed sexual harassment charges against the female officer, claiming that she had attempted to grab his buttocks and created a hostile work environment for him.
 {¶ 24} This evidence shows that McGowan's acts were not directly comparable to those of the other two officers he claimed received different treatment in a manner that would satisfy his burden of making a prima facie case of discrimination. McGowan was the female officer's third-shift supervisor. He wrote sophomoric articles intending to make the female officer look like a sexual libertine. When she complained to him, he heightened his attacks on her, boldly stating that he would not be "intimidated." He engaged in a form of innuendo that left no doubt about who or what he was writing about. And when the female officer took her complaints to the union steward, McGowan used his position of authority as her direct supervisor to retaliate against her. Neither of the two sergeants cited as comparable by McGowan were in positions of authority over the persons involved in their disciplinary action. Moreover, neither of those sergeants retaliated against their victims. In fact, in the only proven instance of unwanted conduct, the officer apologized to his victim, and received disciplinary action for making statements over an open microphone, not for directly confronting the victim of his harassment.
 {¶ 25} Summary judgment shall not be granted unless there is no genuine issue as to any material fact. See Civ.R. 56(C). Having construed the evidence most strongly in McGowan's favor, we find that he did not establish a prima facie case because he did not show CMHA's disparate treatment of someone who is directly comparable to him in all material respects. To underscore this point, McGowan's conduct was so egregious that it ultimately led to the female officer being awarded $1.29 million in a sexual harassment suit against CMHA. McGowan presented no evidence to show that the sergeants engaged in conduct that resulted in similar liability to CMHA. Since McGowan did not establish a prima facie case of race discrimination, the court did not err by granting summary judgment.
 {¶ 26} This brings us to a final point. McGowan argues that CMHA should have been judicially estopped from arguing the egregiousness of his conduct since it defended in court McGowan's culpability in the female officer's sexual harassment charges with the EEOC and in the civil trial.
 {¶ 27} In Smith v. Dillard Dep't. Stores, Inc. (2000),139 Ohio App.3d 525, 533, we quoted Teledyne Indus., Inc. v. Natl.Labor Relations Bd. (C.A. 6, 1990), 911 F.2d 1214, 1217, for the following proposition:
 {¶ 28} "The doctrine of judicial estoppel forbids a party `from taking a position inconsistent with one successfully and unequivocally asserted by the same party in a prior proceeding.' Judicial estoppel is applied by the courts in order to `preserve the integrity of the courts by preventing a party from abusing the judicial process through cynical gamesmanship, achieving success on one position, then arguing the opposing to suit an exigency of the moment.' The doctrine applies only when a party shows that his opponent: (1) took a contrary position; (2) under oath in a prior proceeding; and (3) the prior position wasaccepted by the court. (Citations omitted) (emphasis added).
 {¶ 29} Judicial estoppel cannot apply because McGowan cannot establish the third element — that CMHA's prior position had been accepted by the court. It is true that CMHA defended the sexual harassment charges by claiming that McGowan had not sexually harassed the female officer, but a jury found otherwise and the court entered judgment on the jury's finding of sexual harassment. McGowan's insistence that CMHA is forever bound by its pleadings in a civil case (no matter that the trier of fact found otherwise) simply shows a fundamental misunderstanding of the doctrine.
Judgment affirmed.
It is ordered that appellee recover of appellant its costs herein taxed.
The court finds there were reasonable grounds for this appeal.
It is ordered that a special mandate issue out of this court directing the Common Pleas Court to carry this judgment into execution.
A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.
Kilbane, J., and Dyke, J., Concur.