OPINION
{¶ 1} Plaintiff-appellant, Kathie Planck, appeals from the Clermont County Common Pleas Court's decision denying her request for a preliminary injunction ordering her former employer, defendant-appellee, Cinergy Power Generating Services, LLC ("Cinergy"), to reinstate her to the position of senior clerk.
 {¶ 2} In 1983, Cinergy hired Planck to work as a typist at its Beckjord Power Plant in New Richmond, Ohio. Planck advanced to the positions of assistant clerk, clerk, and then, in 1986, senior clerk. In July 2001, Planck was assigned duties in the plant's Document Control Center ("DCC"), which required her to lift and hang heavy blueprints on racks.
 {¶ 3} In October 2001, Planck contracted pneumonia, which caused her to miss work sporadically for several weeks. Planck's primary care physician, Dr. Nidal Hamame, M.D., subsequently diagnosed her as suffering from restrictive lung disease. Cinergy required Planck to undergo a second medical evaluation with Dr. Douglas H. Linz, M.D., of the TriHealth Corporate Health Services. Dr. Linz found evidence of a "mild pulmonary restrictive defect" and recommended that further studies be performed on Planck to confirm or dispel evidence of a "chronic hyperventilation syndrome," and to assess the severity of her pulmonary restrictive defect. He opined that while the additional testing was pending, Planck "would be capable of continuing to work performing her essential job functions, as [he] underst[oo]d them." He stated that it "would be helpful" for Planck to have a parking space near the buildings' entrance to satisfy the requirement that she be restricted from climbing stairs. He further stated that Planck "should also be restricted from the specific task of hanging blue prints or working with other materials, which generate significant levels of inhalant irritants." Finally, he predicted that these restrictions "would likely be temporary," particularly if the basis of her current respiratory problems was chronic hyperventilation syndrome, which he believed to be "quite treatable through education and a gradually progressive walking program[.]"
 {¶ 4} On December 26, 2001, Planck was contacted by her immediate supervisor at Cinergy, Michael Ciccarella, and asked to return to work. Upon Planck's return, Ciccarella assigned her to a workstation in a building known as the Coal Yard, which was separate from the main office. Planck was no longer assigned duties in the DCC. Work was brought to her from the plant's main facility. Planck sometimes used a portable oxygen tank when she felt dizzy or lightheaded.
 {¶ 5} On January 14, 2002, Dr. Hamame filled out a disability report on Planck at Cinergy's request. The report stated that Planck could return to limited work, with no pushing or pulling, no lifting of more than ten pounds, no prolonged standing or walking, no bending, stooping or twisting, no work above the shoulders, and no climbing ladders. Dr. Hamame also informed Cinergy that Planck should perform only "right handed work," and should work on a flat floor, with no stair climbing. When Cinergy asked Planck how long she was to have these restrictions, she responded by saying that Dr. Hamame told her they were permanent.
 {¶ 6} On February 27, 2002, the Reasonable Accommodation Committee of Cinergy's Human Resources Department determined that Planck could not be accommodated in light of the restrictions that had been placed upon her. On March 1, 2002, Ciccarella sent Planck a letter informing her that it had received medical information indicating that she could no longer perform the essential functions of the senior clerk position. Ciccarella removed Planck from full-time employment and placed her on short-term disability. He further informed Planck that she had six months to return to performing the essential functions of her job with or without reasonable accommodations; find another position within Cinergy, with or without reasonable accommodations; or apply for long-term disability benefits.
 {¶ 7} On April 3, 2002, Planck filed a complaint against Cinergy and her supervisors, James Messmer and Ciccarella, alleging handicap discrimination in violation of R.C. 4112.02(A) and 4112.99. Planck also brought a claim against Cinergy, Messmer and Ciccarella for the "intentional, knowing, and reckless" infliction of emotional harm.
 {¶ 8} On August 27, 2002, Planck moved for a preliminary injunction ordering Cinergy to return her to her Senior Clerk position. On September 1, 2002, Planck was formally terminated by Cinergy. A hearing was held on Planck's motion on September 9, 2002. On November 4, 2002, the trial court issued a decision denying Planck's motion on the basis that Planck had failed to establish by clear and convincing evidence that there is a substantial likelihood that she will prevail on the merits of her handicap discrimination claim. In support of this conclusion, the trial court found that Planck had failed to establish a prima facie case of discrimination, as required by McDonnell Douglas Corp. v. Green (1973),411 U.S. 792, 93 S.Ct. 1817, and Columbus Civ. Serv. Comm. v. McGlone,82 Ohio St.3d 569. Specifically, the trial court found that Planck failed to make a prima facie showing that she could "perform the essential functions of her job with or without accommodation."
 {¶ 9} Planck appeals from the trial court's decision, and assigns the following as error:
 {¶ 10} Assignment of Error No. 1:
 {¶ 11} "The trial court erred by applying the wrong legal analysis when weighing the factors relevant to the issuance of a preliminary injunction."
 {¶ 12} Assignment of Error No. 2:
 {¶ 13} "The trial court erred by not considering the evidence in the record establishing that cinergy has failed to engage in a good faith effort to accommodate planck's handicap."
 {¶ 14} Assignment of Error No. 3:
 {¶ 15} "The trial court erred in failing to issue a preliminary injunction returning planck to her former position as senior clerk at the beckjord power plant."
 {¶ 16} Planck's primary contention is that the trial court erred by overruling her motion for a preliminary injunction ordering Cinergy to reinstate her as a senior clerk. All of the arguments raised in Planck's three assignments of error are directed at trying to prove this contention; thus, we shall jointly address her assignments of error.
 {¶ 17} In ruling on a motion for preliminary injunction, a trial court must consider whether (1) the moving party has shown a substantial likelihood that he or she will prevail on the merits of their underlying substantive claim; (2) the moving party will suffer irreparable harm if the injunction is not granted; (3) issuance of the injunction will not harm third parties; and (4) the public interest would be served by issuing the preliminary injunction. Sinoff v. Ohio Permanente Med.Group, Inc., 146 Ohio App.3d 732, 741, 2001-Ohio-4186, at ¶ 40. The party seeking the preliminary injunction must establish each of these elements by clear and convincing evidence. Vanguard Transp. Sys., Inc.v. Edwards Transfer Storage Co., Gen. Commodities Div. (1996),109 Ohio App.3d 786, 790. The decision whether to grant or deny injunctive relief is within the trial court's sound discretion, and its decision will not be disturbed on appeal absent a clear abuse thereof.Danis Clarkco Landfill Co. v. Clark Cty. Solid Waste Mgt. Dist.,73 Ohio St.3d 590, 604, 1995-Ohio-301.
 {¶ 18} Planck first argues that the trial court improperly applied the "burden-shifting analysis" set forth in McDonnell Douglas Corp. v.Green, which she contends is applicable only in disparate treatment cases that are based upon circumstantial evidence of discrimination, but is not applicable to cases based upon direct evidence. We disagree with this argument.
 {¶ 19} A "disparate treatment" discrimination claim involves an allegation that an employer treats some people less favorably than others because of their race, religion, gender, handicap, etc. See InternationalBroth. of Teamsters v. U.S. (1977), 431 U.S. 324, 335-336,97 S.Ct. 1843. The ultimate issue in such cases is whether the employer intentionally discriminated against the complaining party due to such factors as his or her race, religion, gender or handicap. See id. The complaining party may prove his employer's discriminatory intent by either direct or circumstantial evidence. Id. Where the complaining party seeks to have discriminatory intent inferred from circumstantial evidence, he or she has the burden of establishing a prima facie case of discrimination by showing that he or she (1) is a member of a statutorily protected class; (2) was qualified for the position in question; and (3) despite being qualified, suffered an adverse employment decision under circumstances which give rise to an inference of unlawful discrimination. See McDonnell Douglas Corp., 411 U.S. at 802, fn. 13, andTexas Dept. of Community Affairs v. Burdine (1981), 450 U.S. 248, 254,101 S.Ct. 1089. Once the complaining party establishes a prima facie case, he creates a "`legally mandatory, rebuttable presumption' of intentional discrimination." Burdine at 254, fn. 7. An employer may rebut the prima facie showing of discriminatory intent "simply by producing some evidence that it had legitimate, non-discriminatory reasons" for its actions. Id. at 254-255. "The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff." Id. at 253.
 {¶ 20} "[T]he McDonnell Douglas test is inapplicable where the plaintiff presents direct evidence of discrimination." Trans WorldAirlines, Inc. v. Thurston (1985), 469 U.S. 111, 121, 105 S.Ct. 613. (Emphasis added.) "Direct evidence" is "[e]vidence that is based on personal knowledge or observation and that, if true, proves a fact without inference or presumption." Black's Law Dictionary (1999 7th Ed.) 577. By contrast, "circumstantial evidence" is "[e]vidence based on inference and not on personal knowledge or observation." Id. at 576.
 {¶ 21} Planck cites two pieces of correspondence that Ciccarella set to her in support of her contention that she presented direct evidence of Cinergy's discriminatory intent in this case. In the first, Ciccarella states, "[t]he Company has received medical information that you are permanently restricted from performing the essential functions of your job." In the second, Cicarrella again states that Planck was terminated because she could not "return to the essential functions of your job." However, it is readily apparent that neither of these letters constitutes direct evidence of Cinergy's discriminatory intent, since Cinergy was permitted to discharge Planck if she, in fact, was unable to perform the essential functions of her job. Indeed, the plaintiff in a discrimination case rarely will be able to present direct evidence of a discriminatory motive on his or her employer's part, since not many employers will proclaim their discriminatory motive. Robinson v. Runyon
(C.A. 6, 1998), 149 F.3d 507, 513. But, see, Laderach v. U-Haul ofNorthwestern Ohio (C.A. 6, 2000), 207 F.3d 825 (plaintiff offered direct evidence of discrimination by her employer where she presented evidence that employer had stated he would not promote plaintiff because of her gender).
 {¶ 22} Next, Planck argues that the trial court erred by failing to consider the evidence in the record establishing that Cinergy failed to make a good faith effort to accommodate her handicap. We disagree with this argument.
 {¶ 23} "Ohio law * * * places a duty on employers to make reasonable accommodations of employees with disabilities:
 {¶ 24} "`An employer must make reasonable accommodation to the disability of an employee or applicant, unless the employer can demonstrate that such an accommodation would impose an undue hardship on the conduct of the employer's business.'" Shaver v. Wolske Blue
(2000), 138 Ohio App.3d 653, 663, quoting Ohio Adm. Code 4112-5-08(E)(1).
 {¶ 25} Reasonable accommodations may take the form of job restructuring, which may consist, among other things, of realignment of duties. Ohio Adm. Code 4112-5-08(E)(2). A specific example is, as follows:
 {¶ 26} "If a job entails primarily typing duties with some irregular messenger or delivery tasks, the messenger or delivery tasks could be assigned to an ambulatory employee so that a nonambulatory disabled person with satisfactory typing skills could be employed." Ohio Adm. Code 4112-5-08(E)(2)(a).
 {¶ 27} Ohio Adm. Code 4112-5-08(E)(3) defines the concept of "undue hardship" as follows:
 {¶ 28} "In determining whether an accommodation would result in undue hardship to an employer, the following factors may be considered:
 {¶ 29} "(a) Business necessity;
 {¶ 30} "(b) Financial cost and expense where such costs are unreasonably high in view of the size of the employer's business, the value of the disabled employee's work, whether the cost can be included in planned remodeling or maintenance, and the requirements of other laws and contracts; and
 {¶ 31} "(c) Other appropriate considerations which the employer can support with objective evidence."
 {¶ 32} In failure-to-accommodate cases, "a plaintiff must demonstrate (1) that he or she was disabled, (2) that the employer was aware of the disability, and (3) that he or she was an otherwise qualified individual with a disability in that he or she satisfied the prerequisites for the position and could perform the essential functions of the job with or without reasonable accommodation." Shaver,138 Ohio App.3d at 663-664.
 {¶ 33} Both federal courts and Ohio appellate courts have recognized that an employer's duty to accommodate the disabled requires the employer to interact with an employee in a good faith effort to seek a reasonable accommodation. See, e.g., id., citing Taylor v. PhoenixvilleSchool Dist. (C.A. 3, 1999), 184 F.3d 296, 311-312. "`To show that an employer failed to participate in the interactive process, a disabled employee must demonstrate: 1) the employer knew about the employee's disability; 2) the employee requested accommodations or assistance for his or her disability; 3) the employer did not make a good faith effort to assist the employee in seeking accommodations; and 4) the employee could have been reasonably accommodated but for the employer's lack of good faith.'" Shaver, 138 Ohio App.3d at 664, quoting Taylor,184 F.3d at 319-320. However, an employer cannot be held liable merely for not engaging in the interactive process of seeking a reasonable accommodation; instead, the employee must show that a reasonable accommodation is available. White v. York Internat. Corp. (C.A. 10, 1995), 45 F.3d 357, 363, cited in Shaver.
 {¶ 34} Here, the evidence shows that Planck failed to demonstrate the availability of a reasonable accommodation. Planck essentially sought an accommodation from Cinergy that would have allowed her to perform senior clerk duties in front of a computer terminal, without having "to get up and walk around or with minimal getting up and walking around." Testimony from one of Planck's fellow senior clerks, Rhonda Reed, indicated that approximately 70% of a senior clerk's duties could be performed from a computer terminal. However, this means that approximately 30% or nearly one-third of a senior clerk's duties could not be performed from a sedentary position.
 {¶ 35} Furthermore, there was evidence showing that each of the senior clerks at Cinergy's Beckjord plant had to perform the duties of clerk and assistant clerk as well as senior clerk, since there was not enough senior clerk duties that needed to be performed. The duties of assistant clerk included collecting and distributing the company's mail, filing blueprints, and lifting up to 20 pounds. These are all tasks that Planck's medical restrictions prevent her from performing. Indeed, the physical requirements of the senior clerk position, which require bending, stooping, or reaching, are all activities that Planck is restricted from performing.
 {¶ 36} Admittedly, there was some evidence presented which tended to support Planck's claim that Cinergy had failed to make a good faith effort to accommodate her. For example, the evidence showed that Cinergy had requested Planck to obtain permission from Dr. Hamame to allow her to climb eight steps. Planck obtained said permission, but Cinergy later determined that such a loosening of Planck's medical restrictions was insufficient to allow her to perform the essential functions of her job. In fact, Reed's testimony showed that senior clerks had to "go up and down the stairs once a day up to ten times a day." The testimony also revealed that senior clerks were often exposed to fumes to which Planck was restricted from being exposed. In short, the evidence presented tended to show that the accommodations that Planck requested would not have enabled her to perform the essential functions of the senior clerk position, which included performing the duties of clerk and assistant clerk.
 {¶ 37} Moreover, in addition to determining whether or not Planck was likely to prevail on the merits of her handicap discrimination claim, the trial court also needed to consider whether Planck would suffer irreparable harm if the injunction was not granted. Planck argues that she would suffer extreme financial hardship, including the potential loss of her home, as well as the loss of her and her husband's health insurance, if she were not granted a preliminary injunction. However, it is clear that Planck can be compensated for these losses by an award of monetary damages following the close of the litigation. Under these circumstances, we conclude that the evidence does not clearly and convincingly demonstrate that Planck was entitled to the preliminary injunction she sought. Consequently, the trial court did not abuse its discretion by denying Planck's motion for a preliminary injunction.
 {¶ 38} Planck's first, second, and third assignments of error are overruled.
 {¶ 39} The trial court's judgment is affirmed.
Young, P.J., and Powell, J., concur.