[Cite as *S.W. Ohio Basketball, Inc. v. Himes*, 2021-Ohio-415.]

IN THE COURT OF APPEALS

TWELFTH APPELLATE DISTRICT OF OHIO

WARREN COUNTY

|  |  |  |
|---|---|---|
| SOUTHWESTERN OHIO BASKETBALL, INC., et al., | : | |
| | : | CASE NO . CA2020-08-045 |
| Appellees, | | |
| | : | O P I N I O N |
| | | 2/16/2021 |
| - vs - | : | |
| | : | |
| LANCE HIMES, IN HIS OFFICIAL CAPACITY AS DIRECTOR OF THE OHIO DEPARTMENT OF HEALTH, et al., | : | |
| Appellants. | | |

CIVIL APPEAL FROM WARREN COUNTY COURT OF COMMON PLEAS
Case No. 20-CV-93409

Davidson Law Offices Co., L.P.A., Matthew D. Davidson, David T. Davidson, Matthew D. Davidson, 2 South Third Street, Suite 301, P.O. Box 567, Hamilton, Ohio 45011, for appellees, Southwestern Ohio Basketball, Inc. and Kingdom Sports Center, Inc.

Sams Fischer, LLC, Robert S. Fischer, 5155 Financial Way, Suite 11, Mason, Ohio 45050, for appellee, Warren County Convention & Visitors Bureau

Zeiger Tigges & Little LLP, Marion H. Little, Jr., John W. Zeiger, 41 South High Street, Suite 3500, Columbus, Ohio 43215, special counsel for appellants, Lance Himes, Director of Ohio Department of Health and Amy Acton, former Director of Ohio Department of Health

Dinsmore & Shohl LLP, Robert M. Zimmerman, 255 East Fifth Street, Suite 1900, Cincinnati, Ohio 45202, special counsel for appellants, Lance Himes, Director of Ohio Department of Health and Amy Acton, former Director of Ohio Department of Health

David A. Yost, Ohio Attorney General, 30 E. Broad St., 14th Floor, Columbus, OH 43215.

**S. POWELL, J.**

{¶ 1} Appellants, Lance Himes, in his official capacity as the Director of the Ohio Department of Health,[1] Dr. Amy Acton, in her official capacity as the former Director of the Ohio Department of Health, and the Warren County Health District ("WCHD"), appeal the decision of the Warren County Court of Common Pleas granting a preliminary injunction to appellees, Southwestern Ohio Basketball, Inc. ("SOB"), Kingdom Sports Center, Inc. ("KSC"), and Warren County Convention & Visitors Bureau ("WCCVB"), in this case involving a challenge to certain restrictions contained in a health order issued on August 1, 2020 by Mr. Himes, in his role as the Director of the Ohio Department of Health, governing the resumption of contact and non-contact sports in Ohio during the ongoing COVID-19 pandemic. For the reasons outlined below, we reverse the trial court's decision.

### The Parties

{¶ 2} Dr. Acton is the now former Director of the Ohio Department of Health ("ODH"). Dr. Acton was replaced as the Director of ODH by Mr. Himes.

{¶ 3} WCHD is a governmental agency that serves Warren County residents in the prevention of the spread of disease, the promotion of healthy lifestyles, and protection against the exposure to health risks.

{¶ 4} SOB is an organization that operates youth basketball leagues and tournaments at indoor sports facilities located within Warren County. These youth basketball leagues and tournaments serve youth in grades K-12.

{¶ 5} KSC operates an indoor sports facility in Warren County that hosts year-round soccer and basketball leagues and tournaments. These leagues and tournaments draw

---

1. We note that Mr. Himes is referred to as both the Director and the Interim Director of the Ohio Department of Health within these proceedings. For purposes of simplicity, this court will refer to Mr. Himes as the Director rather than the Interim Director throughout this opinion.

upon teams spanning Ohio and across the greater Midwest region. This is in addition to other services that KSC provides to the local community. This includes, for instance, childcare.

{¶ 6} WCCVB is an organization that co-owns the Warren County Sports Park that stages or hosts a variety of outdoor sporting tournaments. These outdoor sporting tournaments include, but are not limited to, tournaments for soccer, baseball, and lacrosse.

**Ohio's Response to the COVID-19 Pandemic**

{¶ 7} On March 9, 2020, the Governor of Ohio, Mike DeWine, issued an executive order that declared a state of emergency to protect the well-being of Ohioans from the effects of the emerging COVID-19 disease. As described in that order, COVID-19 is a respiratory disease that can result in serious illness or death that is easily transmittable from person to person who are in close contact with each other (within about six feet) through respiratory droplets produced when an infected person coughs, sneezes, or talks. New vaccines promise an eventual end to the COVID-19 pandemic; however, those vaccines are not yet widely available and the COVID-19 disease continues to spread throughout the state and the country at large.

{¶ 8} In response to the growing spread of the COVID-19 disease, which, to date, has resulted in more than 400,000 deaths nationwide, Dr. Acton began issuing a series of health orders pursuant to her authority as the then Director of ODH. These orders were intended to prevent an overtaxing of the healthcare system and hospitals, increase capacity for testing for the virus that causes the COVID-19 disease, SARS-CoV-2, allow for the production of necessary personal protective equipment, and generally curtail the spread of the virus. Among these were health orders closing K-12 schools, orders limiting or prohibiting mass gatherings, and an order closing polling locations for the March 17, 2020 primary elections. These are just a few of the restrictions that have been imposed at the

local, state, and federal level to stem the spread of COVID-19 disease.

{¶ 9}   After being appointed as Dr. Acton's replacement, Mr. Himes also issued a series of health orders pursuant to his authority as the newly appointed Director of ODH. This includes the health order at issue in this case; the Director's Corrected Third Order to Extend the Expiration date of Second Amended Order that Provides Guidance for Contact Sports Practices and Non-Contact Sport Competitions, and Contact Competition, with Exceptions issued on August 1, 2020 ("Director's August 1, 2020 Order").

**The Applicable Statutes as Found in R.C. Chapter 3701**

{¶ 10}  The health orders initially issued by Dr. Acton, and later Mr. Himes, were done in accordance with the authority granted to ODH, and by extension the Director of ODH, by the General Assembly via the Ohio Revised Code.   This includes R.C. 3701.13.   That statute provides, in pertinent part, the following:

> The department may make special or standing orders or rules for preventing the use of fluoroscopes for nonmedical purposes that emit doses of radiation likely to be harmful to any person, for preventing the spread of contagious or infectious diseases, for governing the receipt and conveyance of remains of deceased persons, and for such other sanitary matters as are best controlled by a general rule.

{¶ 11}  R.C. 3701.14(A) further charges the Director of ODH with the responsibility to control and suppress public outbreaks of disease like the COVID-19 disease.   As that statute provides:

> The director of health shall investigate or make inquiry as to the cause of disease or illness, including contagious, infectious, epidemic, pandemic, or endemic conditions, and take prompt action to control and suppress it.

{¶ 12}  R.C. 3701.352 prohibits any person from violating the health orders issued by the Director of ODH and provides:

> No person shall violate any rule the director of health or department of health adopts or any order the director or

- 4 -

department of health issues under this chapter to prevent a threat to the public caused by a pandemic, epidemic, or bioterrorism event.

Such violations are considered a second-degree misdemeanor pursuant to R.C. 3701.99(C).

{¶ 13} R.C. 3701.56 charges local health districts, such as WCHD, with enforcing the orders issued by the Director of ODH. As that statute provides:

Boards of health of a general or city health district, health authorities and officials, officers of state institutions, police officers, sheriffs, constables, and other officers and employees of the state or any county, city, or township, shall enforce quarantine and isolation orders, and the rules the department of health adopts.

**Plaintiffs' Requested Relief: Preliminary Injunction**

{¶ 14} This appeal arises out of the consolidated action brought by SOB, KSC, and WCCVB (collectively, "Plaintiffs") against Mr. Himes, Dr. Acton, and WCHD (collectively, "Defendants"), seeking a declaratory judgment finding R.C. 3701.352 and 3701.99, when used to enforce R.C. 3701.13 or 3701.56, unconstitutional, both facially and as applied to Plaintiffs. To support their claims, Plaintiffs argue that these statutes, as well as the Director's August 1, 2020 Order, violate: (1) their procedural due process rights; (2) their rights to equal protection under the law; and (3) the separation-of-powers doctrine. Movants also argue that these statutes unlawfully delegate "unfettered and unbridled vague power to unelected officials." Therefore, in order to avoid being unnecessarily penalized while this case is pending, Plaintiffs requested the trial court grant them a preliminary injunction enjoining Defendants from enforcing the penalties for noncompliance with Sections 2 and 10 of the Director's August 1, 2020 Order as it relates to contact sports.

**The Director's August 1, 2020 Order**

{¶ 15} In a concerted effort for Ohioans to return to normal activities, Mr. Himes

issued the Director's August 1, 2020 Order. This order permitted the resumption of all sports practices and competitions – for both non-contact and contact sports – so long as the participants, such as players, coaches, athletic trainers, support staff, and officials, complied with certain safety protocols deemed necessary to combat the spread of the COVID-19 disease. These safety protocols were different, however, depending on whether the sport was considered a contact sport or a non-contact sport as defined by the Director's August 1, 2020 Order.

{¶ 16} Specifically, as Section 2 of the Director's August 1, 2020 Order states:

> Contact Sports Practices and Non-Contact Sport Competitions to reopen. Contact practice and training may resume for all sports. Competitive games and tournaments are permitted for non-contact sports, provided, however, only intra-club/team scrimmages are permitted for contact sports. Practices, and/or open gyms with another team or club, or competitive inter-club/team play are not permitted for contact sports unless all involved teams comply with the requirements set forth in Section 10 of this Order so as to minimize the spread of COVID-19. This Order applies to both public and private activities and facilities. These activities, businesses and operations shall continue to comply with Social Distancing Requirements as defined in this Order, including by maintaining six-foot social distancing for players when not engaged in play and coaching. Spectators are not permitted at the contact sports competitive inter-club/team play.

{¶ 17} The Director's August 1, 2020 Order defines the term "contact sports" in Section 3 to include basketball, soccer, and lacrosse. Baseball, tennis, and golf, however, are not included within the definition of "contact sports."

{¶ 18} The record indicates that the distinction between contact sports and non-contact sports was based on the likelihood of the participants being engaged in heavy breathing and heavy exertion while in close proximity with an opponent or a teammate. The distinction between contact sports and non-contact sports was also based on the likelihood of having prolonged, one-on-one interaction between opponents of different teams. As

explained by Mr. Himes, this creates an issue of proximity between players who are guarding one another, in terms of an assignment, as opposed to non-contact sports where the players do not have the same kind of one-on-one interaction, even though they are playing together as part of a team.

{¶ 19} While there are a number of requirements contained in the Director's August 1, 2020 Order that apply to both contact and non-contact sports equally, there are 13 requirements set forth in Section 10 of that order that apply exclusively to players, coaches, athletic trainers, support staff, and officials engaged in contact sports. Those 13 requirements include, among other things, the following:

> i. Not exhibit signs or symptoms of COVID-19 within the past 72 hours prior to competition or if coming from outside the state, before arrival in Ohio. Should a player, coach, athletic trainer, support staff or official exhibit signs or symptoms of COVID-19 they will not be permitted to participate in the competition and should not travel to Ohio;
>
> * * *
>
> iii. Receive a negative COVID-19 test result before traveling to competition; and
>
> iv. A PCR COVID-19 test must be administered to each athlete and team staff member participating in the competition no more than 72 hours prior to the start of the competition and the results must be in hand prior to the start of the competition; any athlete or staff member testing positive and their entire team and staff are prohibited from participating in the competition; and all participants must remain in isolation with other their (sic) teammates and team staff from the time the COVID-19 test is administered until completion of the competition.
>
> * * *
>
> viii. If competition lasts more than four days, administer a second COVID-19 test four days after the first test was administered. A negative test clears the athlete for competition; a positive tests prohibits the athlete, teammates and all team staff from continued participation in the competition.
>
> ix. Be tested every two days after that for the duration of the

tournament * * *.

Section 10 of the Director's August 1, 2020 Order also prohibits spectators "in the venue/facility for any competitive contact sports inter-club/team play."

**Trial Court's Decision Granting a Preliminary Injunction to Plaintiffs**

{¶ 20} On August 3, 2020, the trial court held a hearing on Plaintiffs' request for a preliminary injunction. During this hearing, the trial court heard testimony from Mr. Himes, the Director of ODH. The trial court also heard testimony from Thomas G. Sunderman, Jr., the owner of SOB, Michael Roe, Sr., the owner of KSC, and Phillip Smith, president of WCCVB. Following this hearing, on August 6, 2020, the trial court issued a decision granting a preliminary injunction to Plaintiffs. In so holding, the trial court initially determined that Plaintiffs had a strong likelihood of success on the merits as it relates to both their procedural due process and equal protection claims.

{¶ 21} Specifically, as it relates to Plaintiffs' procedural due process claim, the trial court stated:

> Plaintiffs each testified that they were not only not afforded a pre-deprivation hearing prior to the closure of their business, but there is no avenue for post-deprivation review other than the filing of this lawsuit. Further, there is no avenue to obtain adequate hardship relief in this case. For these reasons, the Court finds that the Plaintiffs have presented clear and compelling evidence that they have been deprived of due process.

{¶ 22} And, as it relates to Plaintiffs' equal protection claim, the trial court stated:

> Ultimately, the Court is cognizant of and respects the weighty responsibilities and pressures faced by Defendants during this past year. Mr. Himes (and Dr. Acton before him) and the Ohio Department of Health are statutorily charged with the responsibility to prevent and suppress the spread of contagious disease during a pandemic and this duty extends to all Ohioans, both young and old. This is no minor task. Concessions and sacrifices have been made by every Ohioan in furtherance of a common goal – mitigating and hopefully eventually eliminating the health risk posed by COVID-19.

{¶ 23} Continuing, the trial court stated:

> However, this Court is also charged with a weighty responsibility – it is this Court's sworn duty to uphold the United States and Ohio constitutions and ensure that their protections blanket and cover all citizens of Warren County. The reasons enumerated by Mr. Himes for treating contact sports differently from non-contact sports are not compelling enough to override Plaintiffs' fundamental right to equal protection of the law. If non-contact sport competition can presumably resume safely with the health protocols for participants and spectators outlined in Section 9 of the August 1st Director's Order, there appears to be no compelling reason why contact sport competition cannot also resume with the same protocols. Plaintiffs have indicated their full intent to comply with Section 9 if allowed to do so.

{¶ 24} The trial court also determined that Plaintiffs had presented clear and convincing evidence that they would suffer "irreparable harm" if the preliminary injunction was not granted. As for KSC, the trial court stated:

> Mr. Roe [the owner of KSC] testified that although some parts of his business are able to operate currently (such as childcare), his organization has already missed out on the major revenue generators, which are spring and summer sports leagues and tournaments. More than that, however, he testified that his organization cannot operate much longer at this rate and he will have to close his business. Closure of this business would negatively impact the ability of the community to have a place to send their children to participate in sports and have a safe, positive environment for childcare.

{¶ 25} The trial court then stated in regard to SOB:

> Mr. Sunderman [the owner of SOB] also testified that his sports league cannot continue to operate in a deficit for more than a few more months. He further testified regarding his personal experience witnessing the emotional struggles children are facing during this time, without many outlets for exercise and physical movement, as well as the potentially permanent impact on older children who are hoping to obtain athletic scholarships in order to go to a university or college.

{¶ 26} The trial court additionally stated in relation to WCCVB:

> Mr. Smith [the president of WCCVB] testified that WCCVB relies heavily on a percentage of the lodging tax collected by Warren

County to be able to operate its facility and pay off the existing loan obtained to build the Warren County Sports Park, which is a newly built facility. Without the revenue generated from the sports tournaments, its funding through the lodging tax dramatically falls. The precise amount of lost revenue cannot adequately be quantified for a number of reasons. If WCCVB is not able to make payments on its loan, the property could potentially revert back to the original owners or be sold.

{¶ 27} The trial court further determined that Plaintiffs had provided clear and convincing evidence that issuing a preliminary injunction would not harm third parties. In reaching this decision, the trial court stated:

As detailed above, treating contact sport competitions differently appears to be an arbitrary and unreasonable distinction, considering the fact that several sports deemed non-contact also have athletes in close proximity for a period of time. Further, the Court has no reason to believe that spectators at a contact sport competition face any higher risk than those at a non-contact sport competition.

{¶ 28} The trial court then stated:

While the Court does not wish to substitute its own judgment for that of the Ohio Department of Health nor can it guarantee the health of all of these athletes and spectators, it can reasonably be inferred that no more harm will result from contact sport competitions being permitted to operate under the same guidelines than that which is already permitted by the Director's Order for non-contact sport competitions.

{¶ 29} The trial court additionally determined that Plaintiffs had provided clear and convincing evidence that the public interest would be served by issuing a preliminary injunction. The trial court explained its decision as follows:

Finally, as discussed above, there are many citizens of Warren County impacted by the Director's Order, not just the Plaintiffs – parents and children are also heavily impacted. These children could be subject to a number of detrimental impacts as a result of this order – from the most immediate (invasive, repeated testing of children from ages 4 through 12th grade, lack of structure and the physical activity provided by sports, lack of access to positive role models, not having family members present in the venue in the event of an emergency) through long-lasting (missed opportunities for scholarships, potential

- 10 -

mental health consequences). Some of these harms are certain to occur and some may be more speculative but, taken together, the Court finds that the public interest is better served by issuing the injunction.

## Appeal

{¶ 30} On August 7, 2020, Defendants filed a notice of appeal. Although their request for a stay was initially denied by the trial court, this court granted Defendants' emergency motion to stay pending appeal on August 28, 2020. Defendants now appeal, raising one assignment of error for review. In their single assignment of error, Defendants challenge the trial court's decision to grant a preliminary injunction to Plaintiffs.

## Plaintiffs Did Not File an Appellee Brief

{¶ 31} Although this court granted Plaintiffs' request for an additional 14 days to file a brief, Plaintiffs did not file an appellee brief with this court. Pursuant to App.R. 18(C), when an appellee fails to file a brief, "in determining the appeal, the court may accept the appellant's statement of the facts and issues as correct and reverse the judgment if appellant's brief reasonably appears to sustain such action." "Whether to accept an appellant's statement of facts and issues as correct under these circumstances is within this court's sound discretion." *Skyward Learning Servs. v. Gray*, 12th Dist. Butler No. CA2019-08-140, 2020-Ohio-1182, ¶ 2, citing *Moore v. Guyton*, 3d Dist. Paulding No. 11-12-01, 2013-Ohio-143, ¶ 9. Therefore, as this court has done previously, this court will exercise its discretion as provided to it by App.R. 18C) and accept Defendants' statement of facts and issues as alleged in their brief in determining this appeal. *See, e.g., Skyward Learning Servs.* at ¶ 2 ("exercising our discretion as provided to this court by App.R. 18[C], this court will accept Gray's statement of facts and issues as alleged in her brief in determining this appeal"); and *In re M.J.*, 12th Dist. Fayette No. CA2007-07-026, 2008-Ohio-3217, ¶ 2, fn. 2 (accepting appellant's statement and facts and issues as correct where "[c]ounsel for

appellee failed to timely file a brief in this matter").

## Rule of Law: Preliminary Injunction

{¶ 32} "The purpose of a preliminary injunction is to preserve the status quo of the parties pending a final adjudication of the case on the merits." *Battelle Memorial Inst. v. Big Darby Creek Shooting Range*, 192 Ohio App.3d 287, 2011-Ohio-793, ¶ 21 (12th Dist.). In ruling on a motion for preliminary injunction, a trial court must consider whether: (1) the moving party has shown a strong or substantial likelihood that he or she will prevail on the merits of the underlying substantive claim; (2) the moving party will suffer irreparable harm if the injunction is not granted; (3) the issuance of the injunction will not harm third parties; and (4) the public interest would be served by issuing the preliminary injunction. *AK Steel Corp. v. ArcelorMittal USA, L.L.C.*, 12th Dist. Butler No. CA2015-11-190, 2016-Ohio-3285, ¶ 9, citing *DK Prods., Inc. v. Miller*, 12th Dist. Warren No. CA2008-05-060, 2009-Ohio-436, ¶ 6; *Union Twp. v. Union Twp. Professional Firefighters' Local 3412*, 12th Dist. Clermont No. CA99-08-082, 2000 Ohio App. LEXIS 475, *6 (Feb. 14, 2000).

{¶ 33} The party seeking the preliminary injunction must establish each of these elements by clear and convincing evidence. *Planck v. Cinergy Power Generation Servs. L.L.C.*, 12th Dist. Clermont No. CA2002-12-104, 2003-Ohio-6785, ¶ 17. No single factor, however, is dispositive. *AK Steel Corp.* at ¶ 10. To that end, in circumstances where "there is a strong likelihood of success on the merits, an injunction may be granted even though there is little evidence of irreparable harm and vice versa." *Fischer Dev. Co. v. Union Twp.*, 12th Dist. Clermont No. CA99-10-100, 2000 Ohio App. LEXIS 1873, *8 (May 1, 2000). But, even then, "[c]ourts should exercise caution in granting injunctions in cases where the court is asked to interfere with or suspend the operation of important works or control the action of another department of government." *Triton Servs., Inc. v. Talawanda City School Dist. Bd. of Edn.*, 12th Dist. Butler No. CA2010-05-112, 2011-Ohio-667, ¶ 6, citing *Cementech,*

*Inc. v. Fairlawn*, 109 Ohio St.3d 475, 2006-Ohio-2991, ¶ 10.

### Standard of Review: Abuse of Discretion

{¶ 34} "The grant or denial of a motion for injunctive relief is solely within the trial court's discretion." *N. Fairfield Baptist Church v. G129, L.L.C.*, 12th Dist. Butler No. CA2010-11-298, 2011-Ohio-3016, ¶ 18, citing *Back v. Faith Properties, LLC*, 12th Dist. Butler No. CA2001-12-285, 2002-Ohio-6107, ¶ 9. Given the discretion afforded to the trial court, this court will not disturb a trial court's judgment granting a preliminary injunction absent an abuse of that discretion. *Freeman Indus. Prods., L.L.C. v. Armor Metal Grp. Acquisitions, Inc.*, 193 Ohio App.3d 438, 2011-Ohio-1995, ¶ 17 (12th Dist.). "A decision constitutes an abuse of discretion when the trial court acted unreasonably, arbitrarily, or unconscionably." *Wells Fargo Bank v. Maxfield*, 12th Dist. Butler No. CA2016-05-089, 2016-Ohio-8102, ¶ 32, citing *Bank of Am., N.A. v. Jackson*, 12th Dist. Warren No. CA2014-01-018, 2014-Ohio-2480, ¶ 9. "[T]he vast majority of cases in which an abuse of discretion is asserted involve claims that the decision is unreasonable." *Effective Shareholder Solutions v. Natl. City Bank*, 1st Dist. Hamilton Nos. C-080451 and C-090117, 2009-Ohio-6200, ¶ 9. "'A decision is unreasonable if there is no sound reasoning process that would support that decision.'" *Stidham v. Wallace*, 12th Dist. Madison No. CA2012-10-022, 2013-Ohio-2640, ¶ 8, quoting *AAAA Enterprises, Inc. v. River Place Community Urban Redevelopment Corp.*, 50 Ohio St.3d 157, 161 (1990).

### Plaintiffs Do Not Have a Strong Likelihood of Success on the Merits

{¶ 35} Defendants initially argue the trial court erred by finding Plaintiffs had provided clear and convincing evidence that there was a strong likelihood that they would prevail on the merits of both their equal protection and procedural due process claims. We agree.

*Plaintiffs' Equal Protection Claim*

{¶ 36} Based on a historic principle first recognized by the United States Supreme

Court over a century ago, it is now well established that "the police power retained by the states empowers state officials to address pandemics such as COVID-19 largely without interference from the courts." *League of Indep. Fitness Facilities & Trainers, Inc. v. Whitmer*, 814 Fed. Appx. 125, 127 (6th Cir.2020), citing *Jacobson v. Massachusetts*, 197 U.S. 11, 29, 25 S.Ct. 358 (1905). "That is especially true where, as here, a party seeks emergency relief in an interlocutory posture, while local officials are actively shaping their response to changing facts on the ground." *South Bay United Pentecostal Church v. Newsom*, __ U.S. __, 140 S.Ct. 1613, 1614 (2020) (Roberts, C.J., concurring in the denial of injunctive relief). This power, however, is not absolute. That is to say, this power "may be exerted in such circumstances, or by regulations so arbitrary and oppressive in particular cases, as to justify the interference of the courts to prevent wrong and oppression." *Jacobson* at 38. That occurs even during a pandemic for "a pandemic does not present the government with a 'blank check' to deny constitutional rights." *Antietam Battlefield KOA v. Hogan*, D.Md. No. CCB-20-1130, 2020 U.S. Dist. LEXIS 215250, *7 (Nov. 18, 2020), citing *Robinson v. Attorney General*, 957 F.3d 1171, 1179 (11th Cir.2020).

{¶ 37} The trial court found the Director's August 1, 2020 Order violated equal protection in that it created "different operating guidelines" to govern "two groups of similarly situated individuals" based on whether those individuals were engaged in contact or non-contact sports.[2] However, even when accepting as true the trial court's decision finding

---

2. The Ohio Supreme Court has concluded that the Equal Protection Clauses in both the United States and Ohio Constitutions to be "functionally equivalent" and subject to "the same analysis under both provisions." *Ferguson v. State*, 151 Ohio St.3d 265, 2017-Ohio-7844, ¶ 29, citing *State v. Aalim*, 150 Ohio St. 3d 489, 2017-Ohio-2956 ¶ 29; *Simpkins v. Grace Brethren Church of Del.*, 149 Ohio St.3d 307, 2016-Ohio-8118, ¶ 46 ("[w]e have interpreted Article I, Section 2 of the Ohio Constitution to be the equivalent of the Equal Protection Clause of the United States Constitution"). This court will therefore look to both state and federal case law for guidance when reviewing the trial court's decision in regard to Plaintiffs' equal protection claim. This court will do the same when reviewing the trial court's decision related to Plaintiffs' procedural due process claim. *See Stetter v. R.J. Corman Derailment Servs., L.L.C.*, 125 Ohio St.3d 280, 2010-Ohio-1029, ¶ 69 (the "due course of law" clause in Article I, Section 16 of the Ohio Constitution is "the equivalent of the Due Process Clause of the United States Constitution"); *Simpkins* at ¶ 34 ("[w]e have generally recognized the Ohio

individuals engaged in contact sports are similarly situated to those individuals participating in non-contact sports, because this case does not involve a suspect class or a fundamental right, the level of scrutiny to be applied is a rational-basis review. [3] *See Young v. Rogers*, 12th Dist. Butler No. CA2001-08-183, 2002-Ohio-5135, ¶ 31 (rational-basis review applies "[i]n cases not involving a suspect class or a fundamental right"), citing *State ex rel. Vana v. Maple Hts. City Council*, 54 Ohio St.3d 91, 92 (1990), citing *Clements v. Fashing*, 457 U.S. 957, 963, 102 S.Ct. 2836 (1982); *see also Adamsky v. Buckeye Local School Dist.*, 73 Ohio St.3d 360, 362 (1995) (a suspect class has "been traditionally defined as one involving race, national origin, religion, or sex"); *State v. Williams*, 88 Ohio St.3d 513 (2000) ("[r]ecognized fundamental rights include the right to vote, the right of interstate travel, rights guaranteed by the First Amendment to the United States Constitution, the right to procreate, and other rights of a uniquely personal nature"); *see, e.g., Burrows v. Ohio High Sch. Ath. Assn.*, 891 F.2d 122, 126 (6th Cir.1989) (applying rational-basis review when rejecting appellants' equal protection claim based on an alleged "distinction between so-called team oriented sports such as soccer and football, and so-called nonteam oriented sports such as golf and swimming").

{¶ 38} Under a rational-basis review, a state action will be upheld "if it is rationally related to a legitimate government interest." *State v. Williams*, 126 Ohio St.3d 65, 2010-

---

Constitution's 'due course of law' provision as the equivalent of the Due Process Clause in the United States Constitution").

3. The Equal Protection Clauses in both the United States and Ohio Constitutions require state actions to treat similarly situated individuals in a similar matter. *McCrone v. Bank One Corp.*, 107 Ohio St.3d 272, 2005-Ohio-6505, ¶ 6 ("the Equal Protection Clauses require that individuals be treated in a manner similar to others in like circumstances"). "In other words, the law must 'operate equally upon persons who are identified in the same class.'" *In re Adoption of Y.E.F.*, Slip Opinion No. 2020-Ohio-6785, ¶ 27, quoting *State ex rel Patterson v. Indus. Comm. of Ohio*, 77 Ohio St.3d 201, 204 (1996). "The comparison of only similarly situated entities is integral to an equal protection analysis." *GTE N., Inc. v. Zaino*, 96 Ohio St.3d 9, 2002-Ohio-2984, ¶ 22. This is because the principles guiding equal protection under the law does not "'require things which are different in fact * * * to be treated in law as though they were the same.'" *T. Ryan Legg Irrevocable Trust v. Testa*, 149 Ohio St.3d 376, 2016-Ohio-8418, ¶ 73, quoting *Tigner v. Texas*, 310 U.S. 141, 147, 60 S.Ct. 879 (1940). This court, however, will treat this requirement as established for purposes of this opinion.

Ohio-2453, ¶ 39, citing *Eppley v. Tri-Valley Local School Dist. Bd. of Edn.*, 122 Ohio St.3d 56, 2009-Ohio-1970, ¶ 15; *In re Vaughn*, 12th Dist. Butler No. CA89-11-162, 1990 Ohio App. LEXIS 3456, *14 (Aug. 13, 1990). That is to say, when applying the rational-basis test to a state action, a distinction between those within a designated class and those who are not, "'must be upheld against equal protection challenge if there is any reasonably conceivable state of facts that could provide a rational basis for the classification.'" *American Assn. of Univ. Professors v. Central State Univ.*, 87 Ohio St.3d 55, 586 (1999), quoting *Fed. Communications Comm. v. Beach Communications, Inc.*, 508 U.S. 307, 313, 113 S.Ct. 2096 (1993). It is only where a distinction is wholly arbitrary that the scrutiny applied under a rational-basis review fails. *Pickaway Cty. Skilled Gaming, L.L.C. v. Cordray*, 127 Ohio St.3d 104, 2010-Ohio-4908, ¶ 41, citing *New Orleans v. Dukes*, 427 U.S. 297, 304, 96 S.Ct. 2513 (1976).

{¶ 39} A court must grant substantial deference to the state when conducting a rational-basis review of a state's distinction (or classification) that is being challenged on equal protection grounds. *State v. Burkhart*, 12th Dist. Clermont No. CA2015-01-004, 2015-Ohio-3409, ¶ 12, citing *Williams*, 2020-Ohio-2453 at ¶ 40. Therefore, under the rational-basis test, reviewing a state's action "'is not subject to courtroom fact-finding and may be based on rational speculation unsupported by evidence or empirical data.'" *State v. Batista*, 151 Ohio St.3d 584, 2017-Ohio-8304, ¶ 22, quoting *Beach Communications*, 508 U.S. at 315. Accordingly, given that courts must grant substantial deference to the state, which is even more true during times of a public health emergency like the COVID-19 pandemic, it is only where the court "can find no set of facts which could possibly support the distinction drawn by the state" that the court will overturn the state action. *Carlisle v. Martz Concrete Co.*, 12th Dist. Warren No. CA2006-06-067, 2007-Ohio-4362, ¶ 41, citing *McGowan v. Maryland*, 366 U.S. 420, 426, 81 S.Ct. 1101 (1961).

{¶ 40} After a thorough review of the record, we find there to be ample facts to support the distinction drawn by the Director's August 1, 2020 Order between those individuals engaged in contact sports and those individuals engaged in non-contact sports so as to overcome the low bar applied in a rational-basis review. This includes, for instance, testimony from Mr. Himes that such a distinction was made based on discussions with several medical experts, health care providers, and laboratory leaders from across the state, the Center for Disease Control and Prevention ("CDC"), multiple national experts, physicians, and other policy makers involved in pandemic planning and policy research related to responding to pandemics, as well as the facts and science existing at that time, who indicated that individuals engaged in contact sports like basketball, soccer, and lacrosse, posed a greater risk of spreading the COVID-19 disease when compared to that of individuals engaged in non-contact sports like baseball, tennis, and golf.[4]

{¶ 41} That is to say, even if imperfect, the Director's August 1, 2020 Order greatly surpasses the low bar imposed under a rational basis review given the fact that such an order serves the legitimate governmental interest of protecting the public from the deadly, easily transferrable COVID-19 disease. *See, e.g., Plaza Motors v. Brooklyn, Inc. v. Cuomo*, E.D.NY No. 20-CV-4851, 2021 U.S. Dist. LEXIS 12726, *15 (Jan. 22, 2021) ("[d]efendants have put forth facts alleging the disparate treatment between businesses inside and outside of the red zones is attributable to the differing COVID-19 infection rates in the respective areas," a distinction that survives rational basis review). That the trial court found otherwise is a clear indication that the trial court improperly substituted its judgment for that of Mr. Himes in his role as the Director of ODH, as well as for the state as a whole, in deciding

---

4. Mr. Himes testified that baseball was not included in the definition of a contact sport because "opponents are not all on the same – on the field at the same time." There is instead a batter and the opposing team in the field, which provides "spacing in between most of the players throughout the game." Mr. Himes testified that this scenario – spacing and generally short, spurts of heavy exertion – provides a "lesser risk of transmission" the COVID-19 disease.

what health orders are necessary for the resumption of youth participation in contact sports during a pandemic like the one caused by COVID-19 disease and the SARS-CoV-2 virus.

{¶ 42} This becomes even more apparent when reviewing Mr. Himes' testimony provided at the August 3, 2020 hearing. Specifically, as Mr. Himes testified at that hearing:

So if you – I mean, you start with the general proposition that mass gatherings are a high-risk activity. However, we do acknowledge and understand the importance that sports plays in children's and adults' lives.

So we felt it was appropriate and necessary to start with some of the low-risk sports, the noncontact sports, in an effort to see if we could slowly up-up that dimmer switch on allowing sports, skills practices, other practices to begin to get kids back out and active, but while taking precautions.

{¶ 43} To do this, Mr. Himes testified that ODH reached out to the Ohio High School Athletic Association, as well as multiple other sports groups, to provide their input on what restrictions should be imposed to allow sports to be played in the safest manner possible while still battling the COVID-19 pandemic. Mr. Himes then testified:

Q: And so in this process, this incremental process under your – your dimmer switch approach, have you set steps along the way where you can turn on some sports, see the consequences health-wise, see if you should go to the next step or not go to the next step?

A: Yes. We've looked at that as we started with some of the low-risk activities. We wanted to see how they were able to be done and complied with, see if there are any cases coming out of those activities. And taking it a step at a time, we could, therefore, go to the next step potentially if the results were good and take on a little bit more risk.

{¶ 44} Mr. Himes testified that this was done by looking at the guidance provided by the CDC, the preeminent authority on public health measures, which stated that "proximity and duration of contact directly correlates to risk." So, with the CDC's guidance in mind, Mr. Himes testified that ODH "looked at those noncontact sports initially as sports that could be done where proximity is – is greater where it – tennis for example, or golf * * * for

- 18 -

example." Mr. Himes testified that this was done because "[d]istance is greater between individuals, which would reduce the risk of transmission of COVID" given "the respiratory droplet transmission, if you're yelling, I'm open, I'm open, or you're heavily breathing around other players, there's that potential for transmission of droplets." Mr. Himes testified that duration of time was also a consideration because "the longer you're in close proximity to another individual, there's a greater risk of transmitting and picking up."

{¶ 45} Mr. Himes then testified as to why the Director's August 1, 2020 Order required individuals engaged in contact sports to be tested for COVID-19 prior to competitions when individuals engaged in non-contact sports were not. As Mr. Himes testified:

> So the contact sports portion of that order requires testing because we are allowing interteam (sic) competition from teams that could come from really anywhere across the United States or across Ohio. And given the fact that they can come from anywhere, there is that increased risk in accordance with the CDC guidelines. * * * So we felt that to allow that would require an additional safeguard and that would be testing of the athletes and participants in order to do that.

{¶ 46} Mr. Himes also testified regarding the level of risk involved in allowing hundreds, and potentially thousands, of individuals to participate in indoor sports tournaments as proposed by Plaintiffs while in the midst of a public health emergency like the COVID-19 pandemic. As Mr. Himes testified:

> So as proposed, the activities and the tournaments, to my understanding, would be a high risk, in that they're involving a great number of individuals, both participants and spectators. I – I think in the thousands, at least over a weekend in a indoor tournament, which, to me, poses a greater risk than outdoor competitions, and especially with spectators being involved, that increases the risk of transmission.

{¶ 47} Mr. Himes further testified:

> [C]ertainly the risk of being infected with COVID is presented to the players who are competing against one another. It's

presented to the spectators who are there in attendance, the workers who are there, putting on the tournament.

But then also any of the individual's families or other people that they go interact with when they leave after the – after the tournament. And it could be in broad geographic regions.

And we know that because many of them could be asymptomatic carriers of the disease, they may not even know that they have it and could expose other folks.

{¶ 48} Concluding, Mr. Himes testified that the requirements set forth in the Director's August 1, 2020 Order were put in place based on the guidelines provided by the CDC in order to mitigate the risk of spreading the COVID-19 disease. These requirements were necessary, as Mr. Himes explained, because "the more physical exertion, the more numbers that are involved, the greater the risk."

{¶ 49} Pursuant to R.C. Chapter 3701, it is the Director of ODH, not the trial court, who is statutorily responsible for controlling and suppressing public outbreaks of disease like the COVID-19 disease. It is also the Director of ODH, not the trial court, who has the resources and expertise necessary to determine how best to combat a public health crisis like the one we face today with the ongoing COVID-19 pandemic. "[T]he judiciary may not 'second-guess the state's policy choices in crafting emergency public health measures.'" *In re Rutledge*, 956 F.3d 1018, 1029 (8th Cir.2020), quoting *In re Abbott*, 954 F.3d 772, 784 (5th Cir.2020). This remains true despite the trial court's greater familiarity with Warren County and the residents of Warren County over whom it presides. This is because, "[c]ourts are not experts in public health and safety issues * * *." *In re United Healthcare Sys.*, D.NJ. No. 97-1159, 1997 U.S. Dist. LEXIS 5090, *21 (Mar. 26, 1997).

{¶ 50} "The precise question of when restrictions on particular social activities should be lifted during the pandemic is a dynamic and fact-intensive matter subject to reasonable disagreement." *South Bay United Pentecostal Church*, 140 S.Ct. at 1613. Mr. Himes,

acting in his role as the Director of ODH, determined that greater restrictions should remain in place for individuals engaged in contact sports as opposed to those individuals engaged in non-contact sports. The trial court clearly disagreed with Mr. Himes' decision. However, although certainly inconvenient, and undoubtably unpopular to some, "[s]haping the precise contours of public health measures entails some difficult line-drawing." *League of Indep. Fitness Facilities & Trainers*, 814 Fed. Appx. at 129. It is not the trial court, but rather Mr. Himes as the Director of ODH, who shapes those precise contours and engages in that difficult line-drawing when constructing the necessary public health measures to battle a disease like COVID-19.

{¶ 51} Simply stated, Mr. Himes' determination as to what health orders were necessary for the resumption of youth participation in contact sports during a pandemic, and the Director's August 1, 2020 Order that resulted, was a rational decision based on the facts and science available at the time. This includes, as noted above, the guidelines provided by CDC to mitigate the risk of spreading the COVID-19 disease. The trial court cannot simply disregard Mr. Himes' offered explanation, but must instead recognize how the Director's August 1, 2020 Order is rationally related to protecting people's health given the testimony and evidence presented at the August 3, 2020 hearing on Plaintiffs' request for a preliminary injunction at issue in this case. Therefore, because the Director's August 1, 2020 Order was not so arbitrary and oppressive so as to justify interference by the trial court, the trial court erred by finding Plaintiffs had provided clear and convincing evidence that there was a strong likelihood that Plaintiffs would prevail on the merits of their equal protection claim.

*Plaintiffs' Procedural Due Process Claim*

{¶ 52} The trial court also erred by finding Plaintiffs had provided clear and convincing evidence that there was a strong likelihood that they would prevail on the merits

of their procedural due process claim. The Director's August 1, 2020 Order is a "generally applicable" order, i.e., an order that applied across the board without singling out any one individual, group, or business. Given its general applicability, the Director's August 1, 2020 Order does not violate Plaintiffs' right to procedural due process. *See, e.g., Hartman v. Acton*, S.D.Ohio No. 2:20-CV-1952, 2020 U.S. Dist. LEXIS 72068, *19-30 (Apr. 21, 2020) (business owner's right to procedural due process was not violated by the stay at home order issued by Dr. Acton, the now former Director of ODH, requiring that all "non-essential businesses and operation must cease" due to the exponential spread of COVID-19 throughout the state because "the Director's Order was a generally applicable order affecting thousands of businesses, and not a decision targeting an individual or single business"); *Frantz v. Beshear*, E.D.Ky. No. 3:20-cv-00034, 2021 U.S. Dist. LEXIS 13234, *9-10 (Jan. 25, 2021) (governor's executive order requiring open businesses to make their employees wear masks while working in an effort to limit the spread of the COVID-19 disease did not violate a business owner's right to procedural due process where the order affected all businesses, organizations, and entities, not just that of owner's business). Therefore, because the Director's August 1, 2020 Order is a generally applicable order, the trial court erred by finding Plaintiffs had provided clear and convincing evidence that there was a strong likelihood that Plaintiffs would prevail on the merits of their procedural due process claim.

### No Irreparable Harm to the Plaintiffs

{¶ 53} Defendants argue the trial court also erred by finding Plaintiffs had provided clear and convincing evidence that Plaintiffs would suffer irreparable harm if the preliminary injunction was not granted. We agree.

{¶ 54} The trial court found each of the three Plaintiffs would suffer irreparable harm if the preliminary injunction was not granted. The trial court's findings, however, are based

- 22 -

almost exclusively on Plaintiffs' lost revenue (either past or future) and the potential that Plaintiffs' respective businesses may be forced to close or be foreclosed upon. "Irreparable harm is an injury for which there is no plain, adequate, and complete remedy at law, and for which money damages would be impossible, difficult, or incomplete." *1st Natl. Bank v. Mountain Agency, L.L.C.*, 12th Dist. Clermont No. CA2008-05-056, 2009-Ohio-2202, ¶ 47. The potential loss of revenue is, without question, monetary in nature. The loss of revenue, therefore, does not constitute irreparable harm. *See Talleywhacker, Inc. v. Cooper*, 465 F. Supp. 3d 523, 543 (E.D.N.C. 2020) (no irreparable harm where plaintiffs put forth insufficient evidence to substantiate assertion that COVID-19 restrictions would result in closure of businesses).

{¶ 55} That is to say nothing of the fact that enjoining the state's actions in combatting the COVID-19 pandemic has the potential for much more than the loss of revenue or the loss of a business, but for the loss of life. *See League of Indep. Fitness Facilities & Trainers*, 814 Fed. Appx. at 129 ("[e]njoining the actions of elected state officials, especially in a situation where an infectious disease can and has spread rapidly, causes irreparable harm"). Despite the trial court's findings, this holds true regardless of how much benefit playing contact sports may have on the youth impacted by the Director's August 1, 2020 Order. Therefore, because the loss of revenue alone is rarely sufficient to demonstrate irreparable harm, particularly when compared to the potential loss of life that may result through contracting the COVID-19 disease, the trial court erred by finding Plaintiffs had provided clear and convincing evidence that they would suffer irreparable harm if the preliminary injunction was not granted.

**Potential for Significant Harm to Third Parties**

{¶ 56} Defendants next argue the trial court erred by finding Plaintiffs had provided clear and convincing evidence that the issuance of the preliminary injunction would not

harm third parties. We agree.

{¶ 57} The trial court determined, based on nothing more than its own inference, that "no more harm will result from contact sport competitions being permitted to operate under the same guidelines than that which is already permitted" by the Director's August 1, 2020 Order. However, considering Mr. Himes' testimony, which was based on facts and science rather than mere inferences from the trial court, if the Director's August 1, 2020 Order was enjoined, "it is not merely livelihoods, but lives that would be put at risk, and the [s]tate has an interest in public health and the safety of its citizens." *Hartman*, 2020 U.S. Dist. LEXIS 72068 at *35. This remains true even though Plaintiffs bear the very real risk of losing their respective businesses given that "the [state's] interest in combatting COVID-19 is at least equally significant." *League of Indep. Fitness Facilities & Trainers*, 814 Fed. Appx. at 129; *see, e.g., Desrosiers v. Governor*, 486 Mass. 369, 390 (2020) ("[a]lthough some businesses and organizations bear a larger burden than others under the emergency orders, this alone does not render arbitrary the restrictions imposed by the emergency orders").

{¶ 58} Although we certainly understand the frustrations that Plaintiffs may feel given the very real impact the Director's August 1, 2020 Order has on their respective businesses, "[t]he public interest in mitigating and combatting the significant danger posed by the spread of COVID-19 outweighs individual business interests in continued operations." *Slidewaters LLC v. Washington Dept. of Labor & Indus.*, No. 2:20-CV-0210-TOR, 2020 U.S. Dist. LEXIS 103350, *16 (E.D. Wash. June 12, 2020), citing *Jacobson*, 197 U.S. at 28. Although tempting, courts "cannot strike down legislative actions simply because judges might think up more productive or practical solutions." *Oaks v. Collier Cty.*, M.D.Fla. No. 2:20-cv-568-FtM-38NPM, 2021 U.S. Dist. LEXIS 15174, *8 (Jan. 27, 2021). Therefore, given the real impact that the issuance of the preliminary injunction could have on the public at large, if not more directly to the residents of Warren County, the trial court erred by finding Plaintiffs

had provided clear and convincing evidence that the issuance of the preliminary injunction would not harm third parties.

## Public Interest Would Not be Served

{¶ 59} Defendants additionally argue the trial court erred by finding Plaintiffs had provided clear and convincing evidence that the public interest is better served by issuing the preliminary injunction. We agree.

{¶ 60} The trial court determined that the parents and children engaged in contact sports would be "heavily impacted" by the Director's August 1, 2020 Order and could be subject to a number of detrimental impacts including, for instance, "invasive, repeated testing of children ages 4 through 12th grade." However, while it may be true that the Director's August 1, 2020 Order does create the potential that Plaintiffs, as well as the parents and children involved in contact sports, could be negatively impacted, none of those impacts come anywhere near the potential impact resulting from increased loss of life if the preliminary injunction was to stand. The fact that, to date, over 400,000 lives have been lost to the COVID-19 pandemic cannot be overstated. Those are not just numbers, but people who were, but no longer are, grandmothers, grandfathers, mothers, fathers, sons, daughters, aunts, uncles, brothers, and sisters.

{¶ 61} That parents and children cannot take part in an inter-club/team basketball, soccer, or lacrosse tournaments put on by Plaintiffs is just a small price to pay to help keep the public safe from this deadly, easily transferrable disease as it continues to spread throughout the country. This is because:

> even if an individual * * * is willing to accept the risk of contracting the virus by partaking in such conduct, the risk is not an individual's risk to take. The risk is also to the lives of others with whom an asymptomatic person may come into close contact, to the healthcare workers who must care for the person one infects, and to [the] overwhelmed healthcare system as a whole.

*South Bay United Pentecostal Church v. Newsom*, 2012 U.S. App. LEXIS 1854, *15 (9th Cir.2021). Therefore, given the significant risk to the general public should the preliminary injunction be permitted to stand, the trial court erred by finding Plaintiffs had provided clear and convincing that that the public interest is better served by issuing the preliminary injunction.

**Conclusion**

{¶ 62} The COVID-19 pandemic has affected nearly every person and business in this country over the past year, including this court. This case presents an example of its effects. However, public health emergencies require the state to take quick, decisive, and oftentimes unpopular measures to protect the public and, ultimately, save lives. This is not just the lives of Warren County residents, but the lives of our fellow citizens across the state and across this great country. Therefore, because enjoining the Director's August 1, 2020 Order would harm the public's interest in preventing the spread of a highly contagious and dangerous disease, especially during a period when case numbers and deaths continue to rise, the trial court erred and abused its discretion by granting Plaintiffs' request for a preliminary injunction. Children having the ability to play basketball, soccer, and lacrosse tournaments cannot replace the loss of a loved one. Accordingly, finding merit to Defendants' single assignment of error, the assignment is sustained and the trial court's decision granting Plaintiffs' request for a preliminary injunction is reversed.

{¶ 63} Judgment reversed.

PIPER, P.J., and HENDRICKSON, J., concur.